R. W. CREECH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ESTATE OF H. G. RANDALL, LUTHER H. RANDALL, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 101780, 104905. Promulgated January 16, 1942.

*Sidney J. Hayles*, *C. P. A.*, and *Noah J. Stone*, *Esq.*, for the petitioners.

*F. L. Van Haaften*, *Esq.*, for the respondent.

OPINION.

BLACK: In each of these consolidated proceedings, in his determination of the deficiencies, the Commissioner has held:

(b) It is held that the acquisition by the Creech Coal Company of 285 shares of its common capital stock from you for a total consideration of $128,250.00 was essentially equivalent to the distribution of a taxable dividend under Section 115 (g) of the Revenue Act of 1936.

Each petitioner, by an appropriate assignment of error, has contested the correctness of this determination, and that presents the principal issue which we have for decision. If it is decided in favor of the Commissioner, then the result is an affirmation of the deficiencies because other more or less minor adjustments made by the Commissioner in each taxpayer's return for the taxable year are not contested.

On the other hand, if we decide the principal issue in favor of the petitioners, there are other issues enumerated in our preliminary statement which we must decide.

Section 115 (g) of the Revenue Act 1936, upon which the Commissioner relies, is printed in the margin.[1]

The pertinent part of article 115–9 of Regulations 94, which is the applicable regulation, is also printed in the margin.[2]

It will be noted that as an example of a distribution which will be generally considered as coming within the provisions of section 115 (g) the regulation gives the following: "A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution to the extent of the earnings and profits accumulated after February 28, 1913."

Such a situation as described in the above quoted regulation was present in *A. E. Levit*, 43 B. T. A. 1077 (petition for review dismissed, Ninth Circuit, Sept. 2, 1941), a case strongly relied upon by respondent in his brief.

In the instant case, however, there was no redemption of a portion of its stock by the corporation pro rata among all its shareholders such as described in the Treasury regulations and as was present in the *Levit* case. There was a purchase by the corporation from two of its principal stockholders of a portion of their stock for the purpose of

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

[2] Art. 115–9. *Distribution in redemption or cancellation of stock taxable as a dividend.*—

\*　　　\*　　　\*　　　\*　　　\*　　　\*

The question whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case. A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution to the extent of the earnings and profits accumulated after February 28, 1913. On the other hand, a cancellation or redemption by a corporation of all of the stock of a particular shareholder, so that the shareholder ceases to be interested in the affairs of the corporation, does not effect a distribution of a taxable dividend. \*　\*　\* in all other cases the facts and circumstances should be reported to the Commissioner for his determination whether the distribution, or any part thereof, is essentially equivalent to the distribution of a taxable dividend.

substantially reducing their indebtedness to the company. The circumstances attending this purchase of stock have been fully detailed in our findings of fact and will be discussed to some extent presently.

While in the instant case, as we have already pointed out, the corporation did not purchase stock from its shareholders pro rata, nevertheless it is true that the Board has held that a pro rata redemption of stock is not necessary to bring the transaction within the provisions of section 115 (g) if other facts and circumstances show that the distribution was essentially equivalent to the payment of a dividend.

Such a case was *J. Natwick*, 36 B. T. A. 866, another case upon which the Commissioner strongly relies. In that case the taxpayer was the owner of 2,914 shares of the corporation's 3,000 shares of outstanding stock. Within the taxable year he delivered to the corporation 843 shares of his stock in consideration for the cancellation of his note for $66,679.22 given to the corporation in a prior year to settle up withdrawals which he had made from the corporation over a period of years. We held that the redemption was one essentially equivalent to the distribution of a taxable dividend under section 115 (g) of the Revenue Act of 1932. We based our decision in that case largely upon the fact that the taxpayer, who was in absolute control of the corporation, had failed to show any plausible motive other than tax evasion for causing the corporation to pursue the form of the transaction which was used. After enumerating certain things which the taxpayer in that case had failed to prove, we said: "* * * the failure, in short, on the part of petitioner to put forward any convincing affirmative reason for the redemption other than the motive apparent on the record of tax evasion, convinces us that the redemption of the 843 shares of the Natwick Co.'s stock on December 31, 1932, was essentially equivalent to a taxable dividend within the meaning of section 115 (g) and should be, accordingly, so treated."

Do the facts of the instant case bring it within the ambit of the *Natwick* case? Respondent strongly argues that they do. We disagree.

The facts show that R. W. Creech and H. G. Randall, the two principal stockholders of the Creech Coal Co., over a period of years had become indebted to the corporation in large amounts. At the end of the year 1933 the debit balance of R. W. Creech was $210,383.29, and the debit balance of H. G. Randall was $221,166.67. In addition to these sums they owed the corporation $75,000 on joint stockholders' account which represented the purchase price of 300 shares of stock acquired from the corporation prior to 1920. In December 1933 H. G. Randall died and left an estate heavily indebted to the corporation. The principal asset of the estate was the stock which it owned in Creech Coal Co. The remaining assets of the estate were of comparatively

small value and if sold would have paid only a very small part of the debt which the estate owed the corporation. L. H. Randall, who was the surviving executor of the estate and one of the officers and directors of the Creech Coal Co., testified that in 1936 he was anxious to get the indebtedness of his father's estate to the corporation reduced and that he knew of no other way that it could be done except to sell part of the stock which the estate owned in the corporation to the corporation, and have the sale price of the stock credited to the estate's debit accounts on the books of the company. He also testified that as officer and director of the corporation he was anxious to get the indebtedness of R. W. Creech correspondingly reduced on the books of the corporation, that the indebtedness had stood for a long time, and that all parties in interest were anxious to get both debit accounts reduced.

He testified that in 1936 negotiations were begun with R. W. Creech and certain minority stockholders of the corporation, and that it was finally agreed that R. W. Creech and the estate of H. G. Randall would each sell to the corporation 285 shares of stock at $450 per share, and that the corporation would credit the resulting amounts to the respective accounts of the debtors. The price of the stock was largely based upon its book value at the time of purchase, which was approximately $433 per share. This agreement was carried out on December 22, 1936.

On December 21, 1936, a cash dividend of $50,000 was declared, being a dividend of $25 per share. Each of the personal accounts of R. W. Creech and H. G. Randall was credited on December 22, 1936, with $7,125 representing the dividend of $25 per share on the 285 shares sold. Other stockholders were paid their dividends in cash.

If it be contended that the corporation, at the time of the purchase of the 570 shares in question, could have declared out of its surplus large enough dividends to have credited the indebtedness of R. W. Creech and the Randall estate with as much as was paid them for the stock and still have been in no worse cash position, that, of course, would be true if these two had been the only stockholders. But they were not the only stockholders. They owned only 1,150 shares of the corporation's outstanding stock and other members of the Creech and Randall families owned 850 shares of the corporation's stock. To have declared a dividend sufficient to credit R. W. Creech and the estate of H. G. Randall with $256,500 on their accounts (which was the aggregate of the amounts credited by reason of the stock purchase), would have required a dividend in excess of $220 per share. Of course, in so far as R. W. Creech and the estate of H. G. Randall were concerned, that could have been done without the outlay of any cash. But to have paid a similar dividend and have paid it in cash to the other stockholders who were not indebted to the corporation, and it may be

remarked that corporate dividends are usually paid pro rata, would have required approximately $180,000 in cash. Evidently the corporation was in no position to pay such a dividend at that time and there is no reason to believe that the directors would have agreed to pay a dividend of $220 per share to R. W. Creech and the estate of H. G. Randall and leave the minority stockholders out of the distribution.

The $50,000 dividend which the corporation paid in December 1936 was substantially twice the earnings of the corporation in the combined years of 1935 and 1936 and was apparently as much as the corporation could have reasonably disbursed in dividends at that time.

This case is not like such cases as *Flanagan* v. *Helvering*, 116 Fed. (2d) 937, where stockholders turned in a ratable number of shares for cancellation and when the redemption and cancellation had been completed the stockholders owned exactly the same proportional interest in the corporation as they did before. That sort of a case falls squarely within the Treasury regulations which we have printed in the margin. As we have already pointed out, we have no pro rata redemption in the instant case. Here, after the purchase of the 570 shares of stock, the several stockholders owned substantially different proportional interests in the corporation than they did before. The 570 shares of stock which were sold to the corporation were not canceled and retired, but were retained in the treasury of the corporation, and carried on its books as an asset at the cost figure of $256,500.

In 1940 the corporation purchased additional coal lands adjacent to the coal seam which was then being mined, and paid $190,000 therefor. This additional coal land was absolutely necessary for carrying on the corporation's coal mining business. The negotiations for such purchase extended over a period of years, the corporation trying to buy for a less price than the owners asked. When it was finally purchased in 1940, the corporation had to borrow $132,000 of the money for the purchase from the First National Bank of Cincinnati, Ohio. It placed with the bank as collateral security for the loan the 570 shares of stock involved in this proceeding, and such shares are still held by the bank as collateral security for the loan.

Thus, after weighing all the facts and circumstances of this case, we conclude that the purchase by the corporation of 570 shares of its common stock from two of its stockholders was for legitimate business purposes of both the corporation and the two stockholders involved and was not essentially equivalent to the distribution of a taxable dividend. On this issue we hold in favor of the petitioners. Cf. *Bona Allen, Jr.*, 41 B. T. A. 206.

Another case urged by respondent, in favor of his determination that the acquirement by the corporation of the 570 shares in question was essentially equivalent to the distribution of a taxable dividend

under section 115 (g), was *L. B. Hirsch*, 42 B. T. A. 566. In that case a 500 percent stock dividend was declared in 1920, thereby capitalizing earnings to that extent, and in the taxable year 1935 each stockholder was given the privilege of turning in 10 percent of his stock at $100 per share rather than book value which was considerably more than $100 per share. Some of the stockholders, including the two principal stockholders, turned in their percentage of the stock for redemption in 1935 and others did so in subsequent years. In the *Hirsch* case, following *J. Natwick*, *supra*, we held for the Commissioner. In this holding we said:

Although it may not be said in these proceedings that there was any relation between the declaration of the 500 percent stock dividend in 1920 and the redemption of the shares in 1935, we think that the evidence supports the determination of the respondent that the redemption of the shares was essentially equivalent to the distribution of a taxable dividend. * * *

Our decision in the *Hirsch* case was affirmed by the Ninth Circuit on the ground that the Board's finding that the redemption of the stock was essentially equivalent to distribution of a taxable dividend is supported by substantial evidence. See *Hirsch* v. *Commissioner*, 124 Fed. (2d) 24.

In the instant case the Creech Coal Co. had never paid a stock dividend and there was no pro rata redemption of the corporation's outstanding stock nor was any offer made to the stockholders of a pro rata redemption such as there was in the *Hirsch* case. In the *Hirsch* case the stock redeemed was canceled and retired, whereas in the instant case the 570 shares acquired have not been canceled, but are still held as treasury stock of the corporation. Because of these and other differences between the facts of the instant case and the *Hirsch* case, we do not regard the latter as controlling in the instant case.

It may well be that the Commissioner would have been justified in treating the withdrawals made by Creech and by Randall from the corporation in prior years as taxable dividends to them in the years in which such withdrawals were made, but we do not have that question before us and we, therefore, make no attempt to decide it. All the parties, the corporation, Creech, the estate of Randall, and the Commissioner, have treated the withdrawals as representing loans made by the corporation to these two stockholders and we have no cause to treat them otherwise.

Regarding the respondent's alternative contention that the purchase by the corporation of the 570 shares in question was a partial liquidation of the Creech Coal Co., we hold upon the authority of *William A. Smith*, 38 B. T. A. 317, and *W. C. Robinson*, 42 B. T. A. 725, that the credits to each petitioner of $128,250 did not represent "amounts distributed in partial liquidation" as that term is used in

section 115 (c) and defined in section 115 (i) of the Revenue Act of 1936. We hold further that the transactions were ordinary sales of stock by petitioners to the Creech Coal Co. at a price of $450 per share. Stock which is purchased by a corporation and held in its treasury is not retired stock. *Borg* v. *International Silver Co.*, 11 Fed. (2d) 147.

This brings us to a consideration of the proper basis to be used in the case of each petitioner.

Petitioner Creech in his return claimed a cost basis for the 285 shares sold as follows:

| Date acquired | Shares | Cost |
|---|---|---|
| June 13, 1917 | 110 | $11,000 |
| July 14, 1917 | 125 | 92,500 |
| July 24, 1925 | 50 | 25,000 |
| Total | 285 | 128,500 |

The parties have stipulated that the 110 shares acquired June 13, 1917, cost $11,000 and that the 125 shares acquired July 14, 1917, cost $31,250; and the evidence shows that the 50 shares acquired July 24, 1925, cost $25,230.77. Petitioner Creech in his brief concedes that he is entitled to a cost basis of only the sum of these three amounts, which is $67,480.77, instead of $128,500 used in his return. On the other hand, the respondent contends that petitioner has failed to identify the shares sold and that, therefore, under the first in, first out rule, petitioner is limited, under the stipulation mentioned in our findings, to a cost basis for the 285 shares of $100 per share or $28,500. Cf. *Helvering* v. *Rankin*, 295 U. S. 123; *Snyder* v. *Commissioner*, 295 U. S. 134; *Davidson* v. *Commissioner*, 305 U. S. 44.

We think the evidence clearly proves that petitioner has identified the 285 shares sold as coming from certificate Nos. 18, 49, and 91, as fully set out in our findings, and that the cost basis of these shares is the above amount of $67,480.77. The gain to petitioner Creech should be recomputed upon that basis.

The estate of H. G. Randall in its return claimed a basis for the 285 shares sold of $128,250, which incidentally is the same as the selling price. Section 113(a)(5) of the Revenue Act of 1936 provides that "If the property was acquired * * * by the decedent's estate from the decedent, the basis shall be the fair market value of such property at the time of such acquisition." The parties agree that the estate acquired the 285 shares of Creech Coal Co. stock in question from the decedent at the time of his death on December 3, 1933. They disagree only as to the fair market value of the stock on that date, petitioner contending it was $450 per share and the respondent contending on brief it was $157.13 per share. The re-

spondent made no determination of the value of this stock in his deficiency notice, but in his brief he arrives at the value of $157.13 by taking the book value of the stock from the balance sheet of the company as of December 31, 1933, after eliminating as an asset the entire amount of the stockholders' accounts receivable in the amount of $545,261.01. We think that the elimination of this $545,261.01 is unwarranted. There is nothing in the record to indicate that these stockholders' accounts were not worth their face value.

The stock of the Creech Coal Co. at the time of the death of decedent Randall on December 3, 1933, had a book value of approximately $429 per share. We don't think it can be held, however, that it had a fair market value at that time equal to its book value. For five years prior to decedent's death in 1933 the corporation had very substantial losses. Its losses as shown by its books were: 1928 loss, $15,175.17; 1929 loss, $46,292.35; 1930 loss, $52,271.00; 1931 loss, $79,741.27; 1932 loss, $47,206.29.

It is true that the corporation had a profit in 1933, the year of the death of the decedent, of $27,645.21, and for the next three years 1934, 1935, and 1936, the corporation also had profits. The fact that the corporation had made profits in the four years 1933, 1934, 1935, and 1936 probably accounts for the fact that in 1936 the corporation was willing to purchase the shares involved in this proceeding at $450 per share, which was somewhat in excess of book value. It must be remembered, however, that it is not as of December 22, 1936, that we have to value the stock. The basic date as of which we must value the stock is December 3, 1933, and, as we have already pointed out, that date followed several years of very substantial losses, with the exception of the year 1933 itself. We have no evidence as to what value was placed upon the stock for estate tax purposes, following the death of H. G. Randall.

No sales of the stock in question were shown at or near the basic date. The sales of the stock for $450 and $500 per share which are shown in the record occurred either in the years of big profits, 1917 to 1920, or within a few years thereafter.

After considering all the evidence, such as the factors above mentioned and opinion evidence at the hearing, which was rather meager, we have found as a fact that the fair market value of the stock of the Creech Coal Co. at the time it was acquired by the estate of H. G. Randall from the decedent was $350 per share. The gain on the 285 shares sold by the estate of H. G. Randall in 1936 should be computed accordingly.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

Kern, dissenting: I respectfully dissent, for the reason that in my opinion the circumstances present in this case require the application of the principle stated by the Board in the case of *J. Natwick*, 36 B. T. A. 866.

---

Mellott, dissenting: I agree with the views expressed by Mr. Kern in his dissent. The two families, each of which owned 50 percent of the stock of the corporation, have collectively received more than a quarter of a million dollars of its earnings and profits. If the Commissioner had attempted to treat the withdrawals by the stockholders in the earlier years as dividends they would have successfully resisted. See *Irving T. Bush*, 45 B. T. A. 609. Shall this substantial portion of the earnings go wholly untaxed? If "actualities" are considered the whole transaction was nothing more than a reciprocal cancellation of the indebtedness of the two families to their wholly owned corporation.

But if the holding of the majority that section 115 (g) is not applicable is correct, then I have considerable doubt as to the holding that section 115 (c) is not applicable. That is premised upon the assumption the stock, under the rationale of *William A. Smith* and *W. C. Robinson*, cited in the majority opinion, was treasury stock. The provision contained in the minutes of the special meeting making the stock not subject to withdrawal or sale except "upon the unanimous vote of the stockholders" prevents it being true treasury stock; for "Treasury stock is an asset in the company's treasury and may be resold at any time as suits the corporate owner's purpose * * *." *Cohen Trust* v. *Commissioner*, 121 Fed. (2d) 689. (For the general effect of a restrictive covenant see *Tex-Penn Oil Co.* v. *Commissioner*, 83 Fed. (2d) 518, and 300 U. S. 481.)

The majority place great reliance upon the testimony of the interested parties to the effect that all were anxious to reduce the indebtedness of the two principal stockholders. They collectively—ignoring in this connection the stock owned by other members of their families—owned 57½ percent of the stock and the corporation had an earned surplus of more than two-thirds of a million dollars. There was no real reason for the corporation to fear that the indebtedness would never be paid or for the stockholders to fear that they would be unable to make payment. A portion of their stock could have been retired and their indebtedness liquidated at any time. Perhaps all were conscious of the fact that this would make the amounts previously withdrawn then taxable to them. This may well have been the reason they undertook to make it appear that the stock, though effectively retired, was still outstanding.

Opper agrees with this dissent.