Isaac C. Eberly v. Commissioner.
Eberly v. Commissioner
Docket No. 26459.
United States Tax Court
1951 Tax Ct. Memo LEXIS 19; 10 T.C.M. (CCH) 1157; T.C.M. (RIA) 51351; December 13, 1951
*19 Petitioner owned practically all the stock in a corporation to which he owed about $130,000. In order to get an improved Dun & Bradstreet credit rating for the corporation, such indebtedness had to be reduced by about 50 per cent. Petitioner turned over 600 shares of $100 par value preferred stock to the corporation for $100 per share, and the corporation reduced his debt by $60,000. Held, under all the facts the transaction did not occur at such time and in such manner as to be essentially equivalent to a taxable dividend. Sigmund H. Steinberg, Esq., 1528 Walnut St; Philadelphia, Pa., for the petitioner. William H. Best, Jr., Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion The respondent determined a deficiency in income and victory tax for the year 1943 in the amount of $52,064.55. The year 1942 is also involved due to the Current Tax Payment Act of 1943. The sole question before us is whether the sale by petitioner to a corporation of a portion of his stock in that corporation was made at such time and in such manner as to constitute a taxable dividend under section 115 (g) of the Internal Revenue Code. *20 Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. Petitioner is an individual residing in Reading, Pennsylvania. His books were kept and his tax return filed on a cash basis. His individual income tax return for the year 1942 and his individual income and victory tax return for the year 1943 were filed with the collector of internal revenue for the first district of Pennsylvania, Philadelphia, Pennsylvania. Petitioner began business as a sole proprietorship in 1910. On September 30, 1922, he transferred the assets of the business to Oakbrook Hosiery Mills, Inc., (hereinafter referred to as Oakbrook), a Pennsylvania corporation with its principal place of business in Reading, Pennsylvania. Oakbrook is and has been engaged in the manufacture of ladies' full-fashioned hosiery. Oakbrook's authorized capital stock consists of 2,500 shares of no par common stock and 5,000 shares of 8 per cent cumulative $100 par preferred stock. All of such stock was issued. 4,500 shares of preferred and 2,250 shares of common stock, with the stated value of $225,000, were issued to petitioner in exchange for his business. The remaining *21 500 shares of preferred stock were issued to petitioner for $50,000 in cash, and an additional 240 shares of common stock were issued to him for $24,000 in cash. The remaining 10 shares of common stock were originally issued for cash to two employees. Petitioner sold some of the preferred stock to the public as follows: 75 shares to four persons in 1922, and 935 shares to six persons in 1926. All of such stock, with the exception of 50 shares, had been repurchased by petitioner or Oakbrook prior to November 17, 1943. The 50 shares were held by Ella F. Keiper, secretary of Oakbrook. Oakbrook paid dividends on its common and preferred stock as follows: Common
Preferred
Year
Amount
Percentage
Amount
Percentage
1923
$ 40,000
8%
1924
40,000
8%
1925
40,000
8%
1926
$ 50,000
20%
40,000
8%
1927
125,000
50%
40,000
8%
1928
50,000
20%
40,000
8%
1929
50,000
20%
40,000
8%
1930
39,700
8%
1931
39,600
8%
1932
39,600
8%
1933
29,700
6%
1934
0
0
1935
0
0
1936
19,800
4%
Total
$ 275,000
$ 448,400
In 1928, to meet competition and demands for its product, Oakbrook engaged *22 in an expansion program involving construction of a new building and purchase of new machinery and equipment. From the beginning of 1928 through the end of 1932, it spent over $1,500,000 on new fixed assets so that the net fixed assets, after deducting depreciation, increased $1,018,836 while its surplus increased only $611,353. To finance this program, Oakbrook borrowed heavily from banks, and in 1931 issued 6 per cent first-mortgage bonds totaling $400,000 to be amortized at the rate of $50,000 annually. In addition, it sold its notes to the firm of Brown & Clayton, investment brokers, for resale to the public. Beginning in 1932, Oakbrook's earnings declined, gross sales declined, and the gross profit ratio declined. Oakbrook suffered net operating losses for the years 1932, 1933, 1934, and 1935. Due to the construction during the expansion program in the early 1930's and the economic depression which followed, Oakbrook was in no position to pay common stock dividends from 1930 through 1940, or to pay preferred stock dividends other than those shown by the tabulation set forth above. Following the outbreak of World War II, Oakbrook's business was seriously affected. Importation *23 of raw silk from Japan, the principal source, stopped during 1941; and Oakbrook practically had to shut down its plant. Prospects for the future were uncertain, operations depending entirely upon allotments to it of nylon, which was also curtailed at that time. Inventories were abnormally low due to merchandise shortages, averaging between $88,000 and $97,000 in the years 1941, 1942, and 1943, whereas they had averaged between $300,000 and $400,000 for the years 1937 through 1940. Accounts receivable were also unusually low in comparison with normal times. Wartime restrictions practically stopped replacements of machinery and parts. Therefore, looking ahead to the end of the War, it was necessary for Oakbrook to build up cash by which it could restore itself to a more normal operating basis. Inventories would have to be greatly increased and a cushion made available to put Oakbrook in a position whereby it could again carry large accounts receivables. Large sums would have to be available for replacements of machinery and for repairs. Technological developments had made a number of Oakbrook's machine obsolete, and new machines would have to be obtained. Old 18 and 20 section machines *24 would have to be converted to 26, 28, and 30 section machines. Working with nylon created a problem because of atmospheric conditions under which nylon had to be manufactured. It was contemplated that air-conditioning equipment, unavailable during the War, would have to be installed as soon as the War was over. Most of these contemplated improvements were actually made in subsequent years. Petitioner over the years had become indebted to Oakbrook so that by the taxable year the debt was substantial in amount. The greater part of such indebtedness had resulted from liabilities incurred due to the depression in the early 1930s and arose primarily from obligations as a stockholder in various banks in and around Reading. Such indebtedness during the years 1929 to 1948, inclusive, as shown on the books of Oakbrook, was as follows: Debit Balance as
Net Debit
of December 31st
Year
Debits
Credits
or Credit
Year
Amount
1929
$129,590.91
$131,940.00
$ (2,349.09)
1929
$ 18,237.41
1930
101,470.69
32,540.00
68,930.69
1930
87,168.10
1931
74,268.88
151,840.00
(77,571.12)
1931
9,596.98
1932
71,777.73
85,190.00
(13,412.27)
1932
(3,815.29)
1933
68,186.99
54,820.00
13,366.99
1933
17,182.28
1934
17,980.39
12,734.60
5,245.79
1934
22,428.07
1935
12,924.53
5,456.81
7,467.72
1935
29,895.79
1936
39,920.93
39,220.00
700.93
1936
30,596.72
1937
25,595.24
31,882.01
(6,286.77)
1937
24,309.95
1938
58,267.97
31,492.00
26,775.97
1938
51,085.92
1939
52,559.34
31,776.08
20,783.26
1939
71,869.18
1940
32,772.32
52,396.71
(19,624.39)
1940
52,244.79
1941
67,872.12
66,429.70
1,442.42
1941
53,687.21
1942
115,308.76
38,100.00
77,208.76
1942
130,895.97
1943
37,297.23
100,000.00
(62,702.77)
1943
68,193.20
1944
36,847.66
40,504.15
( 3,656.49)
1944
64,536.71
1945
55,708.95
50,000.00
5,708.95
1945
70,245.66
1946
14,573.60
40,000.00
(25,426.40)
1946
44,819.26
1947
13,395.65
40,000.00
(26,604.35)
1947
18,214.91
1948
11,468.60
40,664.00
(29,195.40)
1948
(10,980.49)
*25 Prior to December, 1939, Oakbrook had a Dun & Bradstreet published credit rating of "Aa-1" which was a "second or good credit rating and over a million dollars." In December, 1939, Dun & Bradstreet reduced Oakbrook's credit rating to "Aa-1 1/2" which was a "third or fair credit rating" and was a bad rating for a business of Oakbrook's size. As a result, Oakbrook experienced considerable difficulty and hardship in 1940, 1941, and 1942 obtaining merchandise from vendors. Late in 1940 and early in 1941, one Robinson, Oakbrook's accountant, conferred with numerous vendors trying to get increased credit commitments for Oakbrook. In September, 1940, Oakbrook experienced considerable difficulty in getting credit from its chief supplier of silk; and on September 6, 1940, both petitioner and his wife had to give personal written guarantees covering any sums in excess of $25,000 for any credit Oakbrook obtained from this supplier. In June, 1941, petitioner and his wife had to guarantee any credit from this supplier for sums in excess of $15,000. Other guarantees were given to the same silk supplier in 1940 and 1941 by the selling agent for Oakbrook. Also in 1941, Brown & Clayton, Oakbrook's *26 regular note brokers, who had purchased Oakbrook's notes, bearing reduced interest rates, and rediscounted them with banks, declined to take any more notes. With the abnormal conditions resulting from World War II, an improved credit rating for Oakbrook was not immediately necessary. However, petitioner was most desirous of obtaining a better credit rating so that Oakbrook would be in a position to carry on in the post-war period. Therefore, in 1942 and 1943, when Oakbrook again began operating at a profit, petitioner instructed Robinson to seek an appointment with representatives of Dun & Bradstreet in regard to obtaining a higher credit rating for Oakbrook, which Robinson did in February, 1943, meeting with Dun & Bradstreet's representatives in Reading, Pennsylvania. In April, 1943, Robinson met with Leo J. Hughes of Dun &Bradstreet's Special Report Department in Philadelphia, Pennsylvania. The financial statements of Oakbrook for the years ended December 31, 1940, 1941, and 1942, were discussed in detail. The condensed comparative balance sheet for the years 1937 through 1943, inclusive, was as follows: OAKBROOK HOSIERY MILLS, INC.
Comparative Balance Sheet (Condensed)
December 31, 1937, to December 31, 1943
1937
1938
1939
1940
Current Assets
$ 477.460.22
$ 552,442.92
$ 556,104.17
$ 658,857.70
Current Liabilities
332,792.39
302,691.12
285,009.99
408,505.01
Working Capital
$ 144,667.83
$ 249,751.80
$ 271,094.18
$ 250,352.69
Fixed Assets (Net of Depreciation)
1,348,960.60
1,233,310.54
1,159,291.54
1,109,081.76
Other Assets and Deferred Charges
260,844.32
260,192.49
260,629.03
260,986.68
Total
$1,754,472.75
$1,743,254.83
$1,691,014.75
$1,620,421.13
Fixed Liabilities (Bonds)
100,000.00
100,000.00
75,000.00
50,000.00
Net Worth
$1,654,472.75
$1,643,254.83
$1,616,014.75
$1,570,421.13
Preferred Capital Stock
495,000.00
492,500.00
491,000.00
491,000.00
Common Capital Stock
250,000.00
250,000.00
250,000.00
250,000.00
Surplus
909,472.75
900,754.83
875,014.75
829,421.13
Net Worth
$1,654,472.75
$1,643,254.83
$1,616,014.75
$1,570,421.13
*27 1941
1942
1943
Current Assets
$ 459,815.47
$ 508,389.45
$ 640,848.51
Current Liabilities
151,313.16
147,640.42
160,300.02
Working Capital
$ 308,502.31
$ 360,749.03
$ 480,548.49
Fixed Assets (Net of Depreciation)
1,123,568.69
1,013,923.88
945,575.25
Other Assets and Deferred Charges
258,711.53
258,611.71
258,711.05
Total
$1,690.782.53
$1,633,284.72
$1,684,834.79
Fixed Liabilities (Bonds)
Net Worth
$1,690,782.53
$1,633,284.72
$1,684,834.79
Preferred Capital Stock
491,000.00
414,500.00
345,500.00
Common Capital Stock
250,000.00
250,000.00
250,000.00
Surplus
949,782.53
968,784.72
1,089,334.79
Net Worth
$1,690,782.53
$1,633,284.72
$1,684,834.79
The comparative balance sheet set forth above contained items which are eliminated by Dun & Bradstreet in analyzing financial statements to determine credit ratings. For example, debts owed a company by its principal stockholder or any affiliated concerns are eliminated, as are intangible items such as trade-marks and patents. Net profits before taxes, after taxes, and adjustments to surplus for Oakbrook for the years 1941, 1942, and 1943, were as follows: 1941
1942
1943
Net Profit - After all charges except Federal and State
income taxes
$109,389.44
$114,074.94
$ 224,555.90
Federal and State Income Taxes
22,893.81
29,468.27
97,330.47
Increase to Surplus
$ 86,495.63
$ 84,606.67
$ 127,225.43
Adjustments to Surplus - Add or (Deduct)
Adjustment of Prior Years' Taxes
(359.90)
105.34
(2,875.36)
Gain or (Loss) on Sales of Fixed Assets
1,375.00
(42,209.82)
Adjustment to Prior Years' Profits
32,850.67
Other Surplus Adjustments
(23,500.00)
(3,800.00)
$ 33,865.77
[65,604.48)
$ (6,675.36)
Net Increase to Surplus
$120,361.40
$ 19,002.19
$ 120,550.07
Surplus - At Begining of Year
829,421.13
949,782.53
968,784.72
Surplus - At End of Year
$949,782.53
$968,784.72
$1,089,334.79
*28 In arriving at a credit rating, the principal factors considered by Dun & Bradstreet are: The record of profitable operations of the business, the record of prompt payment of its obligations to its suppliers, a satisfactory ratio of debts to net worth, a satisfactory ratio of fixed assets to net worth depending upon the size of the business, the net-working-capital position, and the current ratio. "Current ratio" represents the ratio of the current assets to the current liabilities. Net working capital and current ratio are important factors in arriving at a credit rating; of the two, the more important is current ratio. Robinson stressed the fact, in his discussion with Hughes, that Oakbrook showed an improvement in current ratio in its December 31, 1942, report, which according to Dun & Bradstreet's method of calculation was as follows: 12/31/40
12/31/41
12/31/42
Net Working
Capital
$58,193.16
$123,901.10
$179,361.86
Current Ratio
1.14
1.61
3.04 Robinson also pointed out that the net-working-capital position of Oakbrook had improved between December 31, 1940, and December 31, 1942, by $121,000. While Hughes agreed with these improvements, *29 he objected to two other items in the statement; namely, the ratio of Oakbrook's investment in fixed assets to its net worth and its net working capital, and the large amount due Oakbrook by petitioner which had increased from $53,687 to $130,895 between December 31, 1941, and December 31, 1942. When analyzing the financial statement of a concern worth over a million dollars, credit men consider that the fixed asset investment should range between 50 per cent and 75 per cent of the tangible net worth of the business. As the ratio approaches 75 per cent, and then exceeds it, there is an indication of credit weakness, since a debtor cannot usually pay his creditors with fixed assets. Oakbrook's ratio of fixed assets to net worth at the end of 1941 was 81.7 per cent and at the end of 1942 was 78 per cent. From a credit standpoint, it was "top-heavy" and "tending toward the bad." This was pointed out by Hughes in his conference with Robinson in April, 1943, and was one of the objections which Hughes had to recommending an improved credit rating of Dun & Bradstreet. The other item to which Hughes objected was the amount due Oakbrook by petitioner. An increase in loans to officers drains *30 net working capital and weakens the ability of a business to pay its outside creditors. He stated that the trend shown at that time increasing the amount of the loans outstanding so radically, was bad, and had to be watched. Therefore, Hughes informed Robinson that despite the improved net-working-capital position of Oakbrook as of December 31, 1942, unless the amount due from petitioner was repaid or substantially reduced (by about 50%) in the near future, no improvement in Oakbrook's credit rating could be recommended. Petitioner was in no position at that time to repay such amount. After the discussion between Robinson and Hughes exploring possibilities by which the outstanding debt could be reduced, Robinson told Hughes that several of Oakbrook's creditors had suggested that Oakbrook purchase some of petitioner's preferred stock in Oakbrook from petitioner and apply the proceeds against the indebtedness. Hughes said that if this were done, and if everything else was satisfactory, he would be in a position to recommend an improved credit rating for Oakbrook. Hughes recognized that such procedure would not improve Oakbrook's financial position because such action would decrease *31 both the capital account and the asset account and would, therefore, be a reduction of net worth. Its elimination, however, would not change Dun & Bradstreet's calculation of net working capital (having never been included by it in making such computation), even if it reduced net worth; and Hughes thought it would have a good psychological effect because it would be indicative that such indebtedness would not be increasing. Robinson reported his discussions with Hughes to petitioner including the suggestion of selling some of petitioner's preferred stock to Oakbrook. Petitioner was unwilling to part with any of his preferred stock, and declined to go along with such a suggestion. He decided to wait until the period ending March 31, 1943, when he felt that the quarterly statement would show sufficient improvement to warrant an improved credit rating by itself without any substantial repayment of his indebtedness to Oakbrook. In the summer of 1943, Robinson again conferred with Hughes, renewing his arguments for an improved credit rating based upon the balance sheet for Oakbrook as of March 31, 1943. Such statement showed that petitioner's indebtedness had been only slightly decreased *32 (to $126,138); but since the net working capital increased $61,000 and the current ratio was almost the same, Hughes consented to recommend and subsequently did recommend in August, 1943, that an improved credit rating be assigned to Oakbrook. This recommendation was concurred in by the Philadelphia Rating Committee of Dun & Bradstreet; but the New York Rating Committee, which had the final decision, turned down the recommendation and decided to sustain the already existing rating. Hughes immediately notified Robinson of this action and told him that, based on his (Hughes') experience as a credit analyst, there were only two factors which had not materially improved - the ratio of fixed assets to net worth, and the continuing large amount due Oakbrook from petitioner; and that, in his judgment, they were the only two items which could have caused the credit rating not to be improved, since all other factors that normally would be taken into consideration as having importance had improved. Hughes, therefore, informed Robinson that until petitioner's indebtedness to Oakbrook was substantially reduced, he could not again recommend an improved credit rating. Robinson informed petitioner *33 of Hughes' opinion, but petitioner still did not want to sell any of his preferred stock to Oakbrook and felt that the future financial statements would show sufficient improvement for Oakbrook to get the better rating. After the June 30, 1943, and September 30, 1943, statements were prepared and showed an improved condition, Robinson discussed them with Hughes, but Hughes refused to recommend a better rating until petitioner's indebtedness to Oakbrook had been decreased. This large indebtedness of petitioner to Oakbrook had also been objected to by some of Oakbrook's largest creditors and by petitioner's note brokers. Some of these creditors had initially suggested that petitioner reduce such indebtedness by selling some of his Oakbrook preferred stock to Oakbrook. On November 17, 1943, by action of the board of directors, approved by the stockholders of Oakbrook, Oakbrook purchased 600 shares of petitioner's preferred stock in Oakbrook from him for par value, and the $60,000 was credited against petitioner's indebtedness to Oakbrook reducing such indebtedness to $68,193.20. The following appears in the minutes of the board of directors' meeting on November 17, 1943: "MEETING *34 OF THE BOARD OF DIRECTORS OF Oakbrook Hosiery Mills, Inc., held at its office, Lancaster Ave. and Noble St., Reading, Pa., on the 17th day of November, 1943, at 10 o'clock A.M. * * *
"The chairman [petitioner] called the meeting to order, following which he discussed his indebtedness to the Corporation, and its effect on its financial statement. He related the dilema [dilemma] that he was faced with each time the representative of Dun & Bradstreets [Bradstreet] or from any of the Credit Agencies made inquiry as to the time when this indebtedness would be materially reduced. Even though, as a result of better business conditions the financial statement of the Corporation showed a decided improvement each time it was issued over the past two years, they nevertheless stressed the psychological factor involved because of this ever present indebtedness. "Mr. Eberly stated that with personal taxes as high as it is [was] he could see no way of paying this debt at this time or in the near future in any other way than by the surrender to the Corporation of his share holdings. Consequently he proposed turning over at this time, 600 shares of his preferred stock at a $100.00 *35 par value and thereby reduce his indebtedness in the amount of $60,000.00." * * *
Oakbrook submitted its financial report as of December 31, 1943, (which reflected the reduction in petitioner's indebtedness to Oakbrook) to Dun & Bradstreet; and, following the conference between Robinson and Hughes in April, 1944, Hughes recommended that the credit rating of Oakbrook be improved two notches to "Aa Al" which, according to Dun & Bradstreet's rating code, was "first rating." This recommendation was approved by the Philadelphia Committee and then by the New York Committee, and was put into effect on September 20, 1944. The principal difference between Oakbrook's financial statements of March 31, 1943, and December 31, 1943, was the reduction in petitioner's indebtedness to Oakbrook. Although there was an improvement of $70,000 in net working capital, there was no improvement in Oakbrook's ability to pay its bills, but, rather, a moderate deterioration since the current ratio decreased from 2.93 to 2.77. Cash was substantially reduced from $237,706 to $163,000. Inventory was about the same. Such a reduction in petitioner's indebtedness could not have been accomplished by the payment *36 of a dividend by Oakbrook in 1943. In view of the abnormal conditions existing because of the War and the anticipated expenditures which would be necessary immediately following the War, the payment of any dividends by Oakbrook in that year would not have been good business policy. During the years 1942 and 1943, outstanding preferred stock of Oakbrook was acquired by the corporation, as follows: From Whom Purchased
No. of Shares
Date Purchased
Price Paid
Yaffee & Blumberg Co.
765
12/30/42
$100,000
Theodore Z. Kramer
10
1/6/43
1,000
Theodore Z. Kramer
10
4/2/43
1,000
Theodore Z. Kramer
20
4/30/43
2,000
Isaac C. Eberly
600
11/18/43
* See below
Ella F. Keiper
50
11/19/43
8,800
The preferred stock acquired by Oakbrook was not canceled, but was held as treasury stock. Petitioner always intended and still hopes to repurchase the stock obtained from him. In the comparative balance sheet statements, treasury stock was not included; but in the annual balance sheet statement, *37 it was carried as a separate item. The balance of petitioner's indebtedness to Oakbrook was subsequently repaid by him in cash. It was reduced during the years 1946 and 1947, and completely paid off prior to the end of 1948. No other stock was ever purchased by Oakbrook from petitioner, and no stock dividend was ever declared by Oakbrook. Petitioner reported a capital gain from the sale of his preferred stock to Oakbrook. Respondent determined that such sale was, in effect, a dividend and therefore ordinary income. The purchase of petitioner's preferred stock by Oakbrook in 1943 was not made at such time and in such manner as to be, in effect, a taxable dividend. Opinion RICE, Judge: The sole question is whether the respondent erred in his determination that petitioner realized ordinary income rather than capital gain in the year 1943 as the result of his transfer to Oakbrook of 600 shares of Oakbrook's preferred stock with the resulting elimination of a portion of the debt which he owed Oakbrook. Respondent contends that the transaction falls within section 115 (g) of the Internal Revenue Code. [1] Whether a distribution is essentially a taxable *38 dividend is a question of fact which depends upon the circumstances of each case. William H. Grimditch, 37 B.T.A. 402 (1938). Numerous cases which have been decided on factual situations similar to the one at hand, have established many criteria whose existence or nonexistence aids in the determination of the ultimate factual findings, and it is unnecessary to go into a discussion again of these cases and the criteria contained in them. No one criterion is controlling in a situation such as this. Rather, all must be examined and weighed to determine whether such a purchase by a corporation *39 of part of its own stock results, in effect, in a taxable dividend. Petitioner was indebted to Oakbrook in 1943 in the amount of $128,193.20. Oakbrook had been in serious financial difficulty during the depression from which it started to emerge in the latter part of the 1930s. Before it completely recovered, World War II intervened creating serious difficulties for Oakbrook. Silk was practically nonobtainable, and nylon was strictly allotted. Machinery could not be replaced nor even adequately repaired because of war-time restrictions. Inventories were low as were accounts receivables. Its inventory was less than one-third of normal. Looking ahead to a more normal post-war period, it was necessary to anticipate large expenditures for machinery, air-conditioning for the proper manufacture of nylon, an increase of the inventory to a more normal level, and a need for cash to cushion the increased and more normal accounts receivables. This, in turn, necessitated availability of credit for Oakbrook. In 1940 and early 1941, Oakbrook had experienced difficulty in obtaining credit for purchase of supplies. Petitioner and his wife at first had to co-sign for purchases in excess of $25,000 *40 and then for purchases in excess of $15,000. Oakbrook's Dun & Bradstreet credit rating had been reduced from second to third place. The need for an improved credit rating was imperative for a business the size of Oakbrook. After numerous attempts to obtain such improved credit rating, as we have set forth in detail in our findings of fact, it became apparent that petitioner's debt to Oakbrook would have to be substantially reduced. Oakbrook was in no position to pay dividends of a size sufficient to substantially decrease petitioner's indebtedness. Dun & Bradstreet's agent had indicated that a substantial reduction was necessary which meant approximately 50 per cent (about $60,000 or more). At most, Oakbrook's position might have warranted a very small dividend, and even that would not have been good business policy in view of the abnormal war-time conditions and the expenditures anticipated immediately following the War. Oakbrook's creditors had also objected to the large indebtedness of petitioner to Oakbrook, and had suggested the possibility of reducing this indebtedness by Oakbrook's purchase of part of petitioner's preferred stock. Dun & Bradstreet's agent also felt that *41 this would be a solution and would have a good psychological effect. Petitioner did not want to sell any of his stock to Oakbrook. He felt that increased business and improvement of important credit-rating factors would be sufficient to warrant an improvement in Dun & Bradstreet's rating without a substantial decrease in his indebtedness to Oakbrook. Since, after submission of three financial statements to Dun & Bradstreet, it was found that such was not the case, petitioner finally agreed to the proposed idea; and in November, 1943, by action of the board of directors and with the approval of the stockholders, Oakbrook purchased 600 shares of petitioner's preferred stock for $60,000 and credited this against petitioner's indebtedness to Oakbrook. While it is true that petitioner was, for all practical purposes, the sole stockholder of Oakbrook, such a fact in and of itself does not necessitate the application of section 115 (g). In Bona Allen, Jr., et al., 41 B.T.A. 206 (1940) where the purchase of its stock by a corporation was pro rata from the stockholders, this tribunal held that in the light of all the factors in the case section 115 (g) did not apply. The corporation *42 there did not have enough cash on hand to pay dividends to liquidate the debts owed it by its stockholders, and at that time there was a need for the corporation to retain its cash. Such is true in the instant case. If anything, this case is even stronger because the stock purchased was from the original issue and not from a stock dividend, as was true in the Bona Allen case. Prior to the depression, during the early 1930s, Oakbrook's dividend policy was liberal; and even during the depression years, while Oakbrook was suffering losses, it continued to pay preferred stock dividends. The stock purchased from petitioner was not canceled, but was held in the treasury as treasury stock. In fact, petitioner testified that he desires to repurchase it at some time. The case of J. Natwick, 36 B.T.A. 866 (1937) is distinguishable from the case at bar. In that case, no real business purpose was shown for the purchase of stock by the corporation other than to avoid payment of tax. See R. W. Creech, et al., 46 B.T.A. 93 (1942). In this case we have a definite and valid business purpose. While it is true that an improved credit rating at that particular time was *43 not of great importance to Oakbrook due to the War, it was necessary at the end of the War. No one knew when hostilities would cease and the country would return to a more normal economy. Under such circumstances, sound business policy required an anticipation of the end of hostilities and preparation to meet the problems that would inevitably arise in a post-war economy. Therefore, Oakbrook had a substantial business reason for insisting that petitioner reduce his debt in order that it might enjoy a higher credit rating and strengthen its competitive position. Nor is the manner or purpose for which this debt arose material. Its validity as a debt was not contested by respondent and resulted primarily from the unusual economic situations which developed from the "bank holiday" in the 1930s. We therefore hold that the respondent erred, and that the purchase by Oakbrook of some of its preferred stock was not made at such time and in such manner as to, in effect, be a taxable dividend. In view of the foregoing, it is unnecessary for us to consider petitioner's argument tha a purchase by a corporation of its own stock and the holding of it as treasury stock does not constitute a redemption *44 within the meaning of section 115 (g). Decision will be entered under Rule 50. Footnotes
*. Note: 600 shares preferred stock, par value $100.00, was transferred to Oakbrook by Isaac C. Eberly in reduction of $60,000.00 of his indebtedness to the corporation.↩
1. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. * * *
(g) REDEMPTION OF STOCK. - If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.↩