*ISIDORE HIMMEL AND LILLIAN HIMMEL, PETITIONERS, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91375. Filed October 15, 1963.

*Caption changed by Court order dated Jan. 6, 1964, to Isidore Himmel and Estate of Lillian Himmel, Isidore Himmel, Executor, Petitioners.

*George B. Lourie* and *Arnold R. Cutler*, for the petitioners.
*John R. Berman*, for the respondent.

**OPINION**

The question we have here to answer has, we think not without some justification, been characterized as "vexing" (*Bradbury* v. *Commissioner*, 298 F. 2d 111 (C.A. 1), affirming a Memorandum Opinion of this Court), and even "nightmarish" (*United States* v. *Fewell*, 255 F. 2d 496 (C.A. 5)). It is, as we stated above, whether the distributions made by the H. A. Leed Co. to the petitioner-husband, in connection with the redemptions by the corporation of portions of the petitioner's preferred nonvoting stock in said corporation, were true redemptions for Federal income tax purposes, or whether they were the essential equivalents of dividends.

The subject of redemptions of corporate stock is governed by section 302 of the 1954 Code, and certain other Code sections therein men-

tioned. Briefly, section 302(a) states that if a redemption transaction falls within one of four categories spelled out in section 302(b), then distributions made in connection therewith are to be treated as in part or full payment in exchange for the stock redeemed. Hence, any excess of the amount of the distributions over the shareholder's basis in the stock redeemed is entitled to the more favored tax treatment accorded capital gains. The only subsection (b) category involved in this case is that contained in paragraph (1) thereof, which provides that a redemption will be governed by section 302(a) if "the redemption is not essentially equivalent to a dividend." Petitioner contends that the redemptions here involved were not essentially equivalent to dividends. For the respondent's position, we go to subsection (d) of 302, where we find that "if a corporation redeems its stock (within the meaning of section 317(b) [1]), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies," which is to say, that the distributions will be treated as dividends, fully taxable as ordinary income, to the extent of the corporation's earnings and profits.[2] Respondent contends that the redemptions were equivalent to dividends; and accordingly that subsection (a) of section 302 does not apply, with the result that, as he has determined, the distributions are fully taxable as ordinary income.

One further comment on the statutory scheme seems appropriate. Section 302(c) provides, in general, that in determining the ownership of stock for purposes of section 302, regard is to be had to the attribution of ownership rules laid down in section 318(a). Turning to section 318(a), we find that an individual shall be considered as owning stock which is actually owned by, among others, his children. Applied to the instant case, this means that petitioner is to be considered as owning the 32 shares of the common stock of the corporation (50 percent of the outstanding common stock) which he had, in the earlier year 1950, given to his 2 sons—16 shares to each.

The courts are almost unanimous in holding that the question here involved is factual (see, for example, *Genevra Heman*, 32 T.C. 479,

---

[1] Parenthetically, we note that there is no question raised as to the redemptions here involved falling within sec. 317(b): "stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock."

[2] In the instant case, our findings of fact reveal that the H. A. Leed Co. had earnings and profits far in excess of the amounts distributed to petitioner. So that, if the distributions were essentially equivalent to dividends, the amounts thereof will be fully taxable to the petitioner as ordinary income. Also, we note that the amounts of the distributions were exactly equal to petitioner's basis in the shares redeemed, so that if petitioner prevails, he will have no tax liability arising out of the distributions inasmuch as there would be no gain.

486, aff'd. 283 F. 2d 227 (C.A. 8) [3]), dependent upon the particular facts and circumstances of each case. Nevertheless, the courts have evolved certain criteria which they have applied in determining whether particular distributions are or are not equivalent to dividends. We listed the most frequently utilized of these criteria in our *Heman* case, page 487:

The presence or absence of a bona fide corporate business purpose; whether the action was initiated by the corporation or by the shareholders; did the corporation adopt any plan or policy of contraction, or did the transaction result in a contraction of the corporation's business; did the corporation continue to operate at a profit; whether the transaction resulted in any substantial change in the proportionate ownership of stock held by the shareholders; what were the amounts, frequency, and significance of dividends paid in the past; was there a sufficient accumulation of earned surplus to cover the distribution * * *

We said further in the *Heman* case that there is "no sole decisive test." However, since the very essence of a true dividend is a pro rata distribution of earnings and profits among the shareholders which leaves them in the same or substantially the same relationship *inter se* and *vis-a-vis* the corporation, see *Pullman, Inc.*, 8 T.C. 292, 297, it has been said that of the factors above mentioned, the most important is whether the transaction resulted in any substantial change in the proportionate ownership of stock held by the shareholders. See *Bradbury* v. *Commissioner*, *supra*, where the Court of Appeals stated:

The extent to which the distribution is ratably shared by the stockholders has always been one of the most conspicuous determinants of dividend equivalency. See, e.g., Flanagan v. Helvering, 73 App. D.C. 46, 116 F. 2d 937 (D.C. Cir., 1940); Brown v. Commissioner of Internal Revenue, 79 F. 2d 73 (3 Cir., 1935); R. W. Creech, 46 B.T.A. 93 (1942). In sum "the most obvious earmarks of a dividend is the pro rata distribution of earnings and profit," Bittker and Redlich, Corporate Liquidations And The Income Tax, 5 Tax Law Review 437, 476 (1950), and must be regarded as the basic criterion of whether a particular distribution more closely equates a sale or a dividend. * * *

It is obvious that where—subsequent to a distribution of property—there has been no real shift in intercorporate interest or no significant change in the economic interest of the parties involved, a proclivity towards dividend equivalence usually results.

Bearing the foregoing in mind, we turn to the facts of the instant case. We note once again the impact of section 318(a) upon the facts of this case, to wit, petitioner is to be considered as owning the 32 shares of common stock (50 percent of the corporation's outstanding

---

[3] In this connection the Fifth Circuit said in *United States* v. *Fewell*, 255 F. 2d 496:

"The question whether or not a particular corporate transaction is essentially equivalent to the distribution of a taxable dividend is primarily a question of fact. See Ferro v. Commissioner, 3 Cir., 1957, 242 F. 2d 838, and cases there cited, including Commissioner of Internal Revenue v. Sullivan, 5 Cir., 1954, 210 F. 2d 607. Holding contra, and apparently alone in so doing, is Northrup v. United States, 2 Cir., 1957, 240 F. 2d 304. * * *"

Respondent's regulations provide that: "The question whether a distribution in redemption of stock of a shareholder is not essentially equivalent to a dividend under section 302(b)(1) depends upon the facts and circumstances of each case." Sec. 1.302-2(b), Income Tax Regs.

common stock) actually owned by his sons. The following tabulation shows the percentage changes in the stockownership of the corporation prior to and following each of the redemptions, considering both the common stock deemed constructively owned by petitioner and the two classes of preferred stock:

| Stockholder | Common | | Preferred A—non-voting | | Preferred B | |
|---|---|---|---|---|---|---|
| | Number of shares | Percentage | Number of shares | Percentage | Number of shares | Percentage |
| Prior to first redemption: | | | | | | |
| Petitioner | 32 | 50 | 266 | 100 | 110 | 100 |
| Goldfarb | 32 | 50 | | | | |
| Totals | 64 | 100 | 266 | 100 | 110 | 100 |
| Percentage of total shares outstanding owned by petitioner | | | =92.74 | | | |
| Percentage of voting shares outstanding owned by petitioner | | | =75.89 | | | |
| Following first redemption: | | | | | | |
| Petitioner | 32 | 50 | 216 | 100 | 110 | 100 |
| Goldfarb | 32 | 50 | | | | |
| Totals | 64 | 100 | 216 | 100 | 110 | 100 |
| Percentage of total shares outstanding owned by petitioner | | | =91.79 | | | |
| Percentage of voting shares outstanding owned by petitioner | | | =75.89 | | | |
| Following second redemption: | | | | | | |
| Petitioner | 32 | 50 | 146 | 100 | 110 | 100 |
| Golfarb | 32 | 50 | | | | |
| Totals | 64 | 100 | 146 | 100 | 110 | 100 |
| Percentage of total shares outstanding owned by petitioner | | | =90.0 | | | |
| Percentage of voting shares outstanding owned by petitioner | | | =75.89 | | | |

The foregoing tabulation makes it at once evident that petitioner's rather heavy voting control over the affairs of the corporation was not diluted at all as the result of the redemptions; and that his percentage ownership of all the corporation's shares was lessened by only 2.74 percent as a result. We cannot accord this small reduction sufficient substantiality to defeat dividend equivalency.

Considering the pro rata distribution factor, it is of course true that the distributions in redemption here involved, were not precisely pro rata; for stockholder Goldfarb received nothing, and petitioner received all. But where (as here) the recipient stockholder is the owner of such a heavy percentage of the distributing corporation's stock, the courts have held that the distribution was substantially pro rata, and have found dividend equivalence. See, for example, *Bradbury*

v. *Commissioner, supra*. See also *Keefe* v. *Cote*, 213 F. 2d 651 (C.A. 1), where (although for other reasons dividend equivalence was not found) the First Circuit said:

And, although the distribution was not *pro rata*, it was practically or essentially so in view of the very high percentage of the taxpayer's stockholdings. Thus, under the strict logic of the [net effect] test it would be very doubtful whether the taxpayer could prevail.

The corporation's earnings and profits were more than amply sufficient to cover the distributions to petitioner; and it must be noted that it had never declared a dividend. Also, there was no plan to contract the corporation's business operations prior to the redemptions; nor did any contraction come about as a result thereof. Further, the initiative for the redemptions came from the shareholders rather than the corporation.

Thus far considered, all the factors point toward dividend equivalence. Petitioner relies largely upon an alleged corporate business purpose in the issuance and redemption of the preferred stock, to tip the scales in his favor. His argument is, in brief, that the preferred stock was issued to take the place of a debt owed by the corporation to the petitioner, i.e., the open account liability to petitioner of $37,600 which was reflected in the corporation's books of account and in its financial statements. He asserts that the alleged substitution was made in order to improve the corporation's credit standing by enabling it to obtain its raw materials from suppliers and cash loans from banks, without the necessity of petitioner having to act as guarantor of the corporation's payment to the suppliers and to the lender banks.

The respondent counters this argument by the contention that the sums advanced by petitioner to the corporation aggregating $37,600 at December 27, 1948, were contributions of equity capital to the corporation, which did not give rise to a true debt. Thus, he argues, when the preferred stock was issued, it was merely evidence of an equity investment by an equity instrument, rather than the substitution of an equity instrument in form to evidence what was in reality a debt. We think the respondent is correct. We stated in the case of *Emanuel N. (Manny) Kolkey*, 27 T.C. 37, 58, affd. 254 F. 2d 51 (C.A. 7), that the essential difference between an investor and a creditor was that the former intended to embark upon the corporate venture taking the risk of loss attendant upon it, while the latter intends to avoid such risks insofar as he is able to, and hence merely to lend the capital to others who will take the risks. Appraising the circumstances surrounding petitioner's advances to the corporation, we believe that those advances constituted equity capital put at the risk of the business. The corporation was in its infancy and the investment in its capital stock was only $8,100. It required considerably larger amounts

of funds for operating capital in order to carry on the day-to-day operations of its business of processing aluminum. And petitioner's advances were to meet this very need. He was candid in testifying that he expected repayment only when the corporation was able to do so; and hence there was no definite and fixed obligation that he be repaid. Moreover, petitioner neither sought nor received any interest on his advances. To repeat then, we think that petitioner's advances constituted equity capital. It follows that when the preferred stock was redeemed, it was not in substance the repayment of a loan, as petitioner contends, but rather the distribution of earnings and profits to one who was stockholder in fact as well as in form.

The fact that the preferred stock was issued to evidence an equity investment rather than a debt, serves, we think, to distinguish the instant case from such cases as *Keefe* v. *Cote, supra, Estate of Henry A. Golwynne*, 26 T.C. 1209, and *G. E. Nicholson*, 17 T.C. 1399, upon which petitioner relies. In each of those cases, the court found that the preferred stock involved had been issued to take the place of what was clearly a corporate debt to the shareholders—done for the purpose of improving the corporation's credit standing. The courts in those cases held that the issuance and redemption of the preferred stock there involved were for legitimate corporate business purposes; and that the distributions were not essentially equivalent to dividends. We believe those cases are distinguishable on their facts.

Moreover, we add that recent cases in the Courts of Appeals have tended to place the "legitimate corporate business fact" in its proper perspective, as not the dominant factor to be considered in dividend equivalency cases, but rather as one factor to be considered along with all the others in such cases. See *United States* v. *Fewell, supra;* and *Bradbury* v. *Commissioner, supra.*[4] In the instant case, we are of the opinion that even if the preferred stock had been issued to take the place of a corporate debt, such circumstance would not be sufficient, in the light of all the other circumstances here pointing to dividend equivalency, to warrant a decision herein for petitioner.

Petitioner also urges that the two distributions in redemption here involved were but steps in a plan, the overall aim of which was a com-

---

[4] The Second Circuit has taken an exceedingly dim view of the relevancy of the "legitimate corporate business purpose." See *Northup* v. *United States*, 240 F. 2d 304, where the court stated its views, as follows:

"Indeed, some courts still give weight to the presence of a legitimate corporate purpose, particularly where the redemption is contemporaneous with a contraction of corporate business. * * * [Citing cases.] 'Occasionally, comments on the lack of business purpose are thrown in as a sort of make-weight, where the conclusion is otherwise inescapable that the pro rata redemption of stock has precisely the same effect as would follow the declaration of a dividend. See Commissioner of Internal Revenue v. Roberts, 4 Cir., 203 F. 2d 304. In any event, in Kirschenbaum v. Commissioner of Internal Revenue, 2 Cir., 155 F. 2d 23, we recognized that our earlier doctrine had been overruled. Section 115(g) requires an examination of the net effect of the transaction as a whole, not an examination of the motives or purposes that prompted it. Cf. Flanagan v. Helvering, 73 App. D.C. 46, 116 F. 2d 937, 939–940."

plete elimination of petitioner's interest in the corporation. He points to the action taken at the stockholders meeting of February 8, 1956, whereby the corporation's treasurer was instructed to open a special checking account for the purpose of depositing therein a minimum of $3,000 per year to be used solely for retiring petitioner's preferred stock; and to the agreement of December 17, 1956, wherein the corporation agreed to purchase all of his preferred stock in the event of his death, and, so far as it was able to do so, to make such redemptions as it desired of such stock during petitioner's lifetime. The strongest case in support of petitioner's argument is that of *In re Lukens Estate*, 246 F. 2d 403 (C.A. 3), reversing 26 T.C. 900. In the *Lukens* case, it appeared that the decedent-father had decided to terminate his interest in a corporation, in which the only other stockholders were his son and his daughter. In 1946 he made a gift of a block of stock to each child; in 1948 the corporation redeemed another portion of his stock, at the par value which the father had paid therefor, and applied the proceeds against his indebtedness to the corporation; and in 1950 he gave the remainder of his stock to his children, and thereby extinguished his interest in the corporation. The Commissioner determined that the 1948 redemption was essentially equivalent to a dividend; and we sustained his determination. The Court of Appeals, in reversing, stated that the 1948 "transaction was a significant step in a withdrawal, begun two years earlier and completed two years later," whereby his entire interest was eliminated. The court had earlier pointed out that:

where the fundamental fact appears that the stockholder is surrendering his entire interest, it is a contradiction of terms to characterize the transaction as a dividend which presupposes persisting ownership rights. * * *

It is our judgment that the facts of the instant case are distinguishable from those of the *Lukens* case, and hence the decision in that case does not furnish precedent for the disposition of the case at bar. Balance sheets of the corporation as of the ends of the years 1956 and 1957 reveal that it did have a special checking account (presumably the one called for by the February 7, 1956, resolution) at those two dates; but the balance sheet for December 31, 1958, does not contain among the assets any cash in a special checking account. We cannot be certain whether this points to an abandonment of the tentative steps taken to provide a fund for redemptions. We do note that there was no testimony that any further redemptions of petitioner's preferred stock were made, following those in 1957 and 1958 here involved. It is also worth noting that the agreement entered into between petitioner and the H.A. Leed Co. on December 17, 1956, mentioned in our Findings of Fact, provides in substance and in here pertinent part, that so long as petitioner lives, the corporation *may* redeem his preferred shares at par, provided that it is "financially able to redeem same," *if* its

other shareholders desire that this be done. The evidence in the instant case does not satisfy us that there was any firm and fixed plan to eliminate petitioner from the corporation, of which plan the redemptions here were but steps or parts.

After considering and weighing all the evidence, and after due and careful consideration of the authorities above cited, we are impelled to conclude and hold that the net effect of distributions in redemption of petitioner's preferred nonvoting stock during the years 1957 and 1958, was essentially equivalent to the distributions of corporate dividends. We therefore decide the case for the respondent.

*Decision will be entered for the respondent.*