Isidore **HIMMEL** and Estate of Lillian
Himmel, Isidore Himmel, Executor,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

Docket 28745.

United States Court of Appeals
Second Circuit.

Argued Sept. 24, 1964.

Decided Nov. 25, 1964.

Arnold R. Cutler, Boston, Mass., Daniel D. Levenson, Boston, Mass. (George B. Lourie, Boston, Mass., on the brief), for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harold C. Wilkenfeld, Robert H. Solomon, Department of Justice, for respondent.

Before MOORE, SMITH and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge.

Isidore and Lillian Himmel (collectively referred to as the taxpayer) petition for review of a decision of the Tax Court, 41 T.C. 62 (1963), upholding the Commissioner of Internal Revenue's determination of deficiency in taxpayer's income tax for the years 1957 and 1958 in the amount of $2,346.11 and $3,287.45, respectively. In both years, taxpayer received from the H. A. Leed Co. in redemption of certain shares of stock held by him, payments which he did not report in his tax returns for those years. The Commissioner and the Tax Court found the payments to be essentially equivalent to dividends, which, under the Internal Revenue Code of 1954, Section 302,[1] should have been treated as ordinary income. We disagree with that finding and, accordingly, reverse the judgment.

█ Whether a redemption "is 'essentially equivalent to' a dividend, involving as it does application of a statutory rule to found facts, is a question of law * * *." Northup v. United States, 240 F.2d 304, 307 (2d Cir. 1957); see 1 Mertens, Federal Income Taxation sec. 9.100, at 213 n. 47.2 (Oliver ed. 1962); cf. Kerr v. Commissioner, 326 F.2d 225, 229 (9th Cir. 1964).[2] But see Cleveland v. Commissioner, 335 F.2d 473, 477 (3d Cir. 1964).

In 1946 taxpayer with Leonard Goldfarb and Edward G. Schenfield incorporated the H. A. Leed Co. to process aluminum. The original capital was $8,100 and each shareholder received 27 shares of $100 par common stock. Taxpayer was president until early 1956. From the beginning until late 1948 taxpayer made advances to the company which were carried on the books as "Loans Payable." He expected to be repaid when the company was able to do so. In a recapitalization in late 1948 to improve the company's credit position, each shareholder received 5 more shares of common in cancellation of $500 notes to each. Taxpayer also received 266 shares of $100 par Class A 2% cumulative nonvoting preferred and 110 shares of $100 par Class B 2% cumulative voting preferred, in cancellation of the then outstanding indebtedness to him of $37,600. Both classes of preferred stock were created at that time and both were redeemable, but the Class B stock could not be redeemed until all the Class A stock had been redeemed. In 1950 taxpayer gave his 32 shares of common to his two sons, 16 to each. In 1954 on the death of Schenfield, the company purchased his 32 shares from his estate. By corporate action in February 1956 a special account was set up into which $3,000 per year was to be deposited solely for the retirement of the company's outstanding preferred stock of the total par value of $37,600. In late 1956 the shareholders voted to redeem 50 shares of Class A at par and the taxpayer agreed to waive all accrued but unpaid dividends on the redeemed shares. Similar provision was made for redemption at taxpayer's death and for other redemptions during taxpayer's life. In January 1957,

1. "§ 302. Distributions in redemption of stock
   "(a) General Rule.—If a corporation redeems its stock * * * and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.
   "(b) Redemptions treated as exchanges.—
   "(1) Redemptions not equivalent to dividends.—Subsection (a) shall apply if the redemption is *not essentially equivalent to a dividend.*

*   *   *   *   *
   "(d) Redemptions treated as distributions of property.—Except as otherwise provided in this subchapter, if a corporation redeems its stock * * * and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies." (Emphasis added.)
   All references are to Int.Rev.Code of 1954 unless otherwise indicated.

2. Though equivalence depends upon the facts, see Treas.Reg. § 1.302–2(b), it is not itself a fact.

50 shares of Class A were redeemed for $5,000, and in 1958 70 shares of Class A were redeemed for $7,000. No dividends had been paid through December 31, 1958, and in both 1957 and 1958 earnings and profits exceeded the amounts distributed.

■ Distributions of property by a corporation to a shareholder to the extent they are made out of earnings and profits, section 316, are generally to be included in the gross income of the shareholder. Section 301(a), (c). The ordinary income tax rates would thus be applicable. However, if a corporation redeems its stock, section 317(b), the redemption may be treated as a distribution in part or in full payment in exchange for the stock, section 302(a), thus subjecting the distribution to tax only in the event of capital gains. But this preferential treatment may be availed of only in certain circumstances, one of which is that "the redemption is not essentially equivalent to a dividend." Sections 302(b) (1), 302(d). Primarily the problem is to determine and apply the appropriate tests of dividend equivalence. But the relevance of each of the possible criteria [3] depends largely upon the particular capital structure-distribution pattern.

■ Ownership of stock can involve three important rights: (1) to vote, and thereby exercise control, (2) to participate in current earnings and accumulated surplus, and (3) to share in net assets on liquidation. Ownership of common stock generally involves all of these. Ownership of preferred stock generally involves the last two, but only to limited extents, unless otherwise provided. Payments to a shareholder with respect to his stock can be of three general sorts: (1) distribution of earnings and profits which effects no change in basic relationships between the shareholder and

either the corporation or the other shareholders—i. e., a dividend; (2) payments to a shareholder by a third party in exchange for ownership of the stock and its attendant rights, which accordingly eliminates or contracts *pro tanto* the shareholder's rights—i. e., a sale; and (3) payments to a shareholder by the corporation in exchange for ownership of the stock. With the last, which can often formally be called a redemption, the effect on the shareholder's basic rights vis-a-vis the corporation and other shareholders depends upon many facts. It is possible for such a transaction to resemble, exactly or substantially, either a dividend or a sale. For tax purposes the payment is considered ordinary income if, by its "net effect," it is "essentially equivalent to a dividend."

■ The hallmarks of a dividend, then, are pro rata distribution of earnings and profits *and* no change in basic shareholder relationships. Too frequently the inquiry in § 302(b) cases does not keep this sufficiently in mind. Existence of a pro rata distribution may be determined by comparing the patterns of distribution to see whether the shareholders received the same amount as they would have received had the total distribution been a dividend on the common stock outstanding. But, aside from a single-shareholder corporation, it is not enough merely that the taxpayer received the same amount as he would have received with a dividend, for that could be the result of a sale of some stock to a third party. Rather, pro rata distribution indicates also, at least in a one-class capital structure, the extent to which—if any—the basic rights of ownership have been affected. Where there is only common those rights would exist in proportion to shares held. Therefore, quite often the net effect of a distribution may adequately be gauged

3. Among the factors listed in 1 Mertens § 9.100, at 214–15 are: presence of a real business purpose, shareholder initiative, amount of earnings and profits available, past dividend record, substantial change in ownership and control, disloca-tion of relative shareholder interests, contraction of corporate operations, continued profitable operations, comparison with a dividend, special circumstances at the time of redemption, and time between issuance and redemption.

by determining what would have been the pattern with a dividend.[4]

Additional and more difficult problems are raised when a corporation has more than one class of stock. The additional class will often be a preferred, which typically has no voting rights, has preferential though limited rights to participate in earnings, and has rights to share in liquidation only to the extent of capital contributed, and perhaps accrued but unpaid dividends. Redemption of some preferred stock consequently may cause different changes in a shareholder's total rights than would redemption of common. Even more is this so when the preferred and common are not held in the same proportions by the same shareholders. Shares of different classes should therefore not casually be lumped together. For example, redemption of a nonvoting preferred can have no effect on relative voting rights, and can never meet the "substantially disproportionate" tests of section 302(b) (2). Rights to earnings will depend upon the exact preference given the preferred, e. g., whether it participates beyond its dividend, whether the dividend is cumulative, etc. Rights on liquidation may vary similarly.

■■ These problems are all well illustrated by this case. In the two years in question, taxpayer received from the corporation $5,000 and $7,000, in redemption of 50 and 70 of the 266 shares of Class A nonvoting preferred, all held by him. Other shareholders received nothing. Had the same funds been distributed as a dividend on the 64 shares of common outstanding, Goldfarb would have received $2,500 and $3,500 and taxpayer would actually have received nothing, as he held no common. However, by dint of the attribution rules, section 318(a) (1) (A) (ii), he would be deemed to have owned his sons' shares and therefore to have received the $2,500 and $3,500 actually received by them. Thus he would have received 50% of what he actually did receive. Even if the funds had first gone to pay accumulated but unpaid dividends on the two classes of preferred, taxpayer would have received, according to the Commissioner's calculations, only 82.5% of what he actually did receive.[5]

With a multi-class capitalization, the amount of a hypothetical dividend that would have been received can reflect the shareholder's right to participate in current and accumulated earnings, though it is a less accurate index of the effects on voting power or rights on liquidation. Here, an alteration in rights to earnings of 17.5% (waiver of dividends) or 50% (nonwaiver of dividends) is substantial enough in itself to bar treatment of the redemption as "essentially equivalent to a dividend." In no other case has a comparable difference apparently been considered otherwise. For example, "no equivalency" was found in the following cases. In Northup v. United States, supra, the three taxpayers involved in the case received aggregately 41.6% of a redemption of preferred, though they would have received 66.6% of a dividend on the common—a difference of 25%. Several of the shareholders there held only pre-

---

4. In stressing the importance of the "substantially pro rata" test, we are not unmindful of the more specific provision of § 302(b) (2). The pro rata test, quite assuredly, developed under § 115(g) whose only provision was for distributions "essentially equivalent to a dividend." While the 1954 revision added specific "safe harbors" for redemptions that completely terminate a shareholder's interest in the corporation, § 302(b) (3), and for distributions that are substantially disproportionate according to certain precise quantitative standards, § 302(b) (2), it also kept the 1939 Code provision for distributions not "essentially equivalent to a dividend." Moreoever, it stated that failure to meet any one of the more specific tests should not be taken into account in applying the old test. § 302 (b) (5). And since 302(b) (2) is keyed only to changes in voting power, it is obvious that without 302(b) (1) a substantially disproportionate redemption of nonvoting stock could never qualify for capital gain treatment.

5. We do not consider what might have been the proper tax treatment for the amount of dividends actually waived as neither party raised the issue.

ferred or only common, and those holding both held them in different proportions. See Northup v. United States, 137 F.Supp. 268, 269 (D.Conn.1955). In Cobb v. Callan Court Co., 274 F.2d 532 (5th Cir. 1960), the major shareholder received 50% of a redemption payment and two others each received 25%, though the shares of a dividend would have been 67% :15% :15%—differences of 17% and 10%. In Arthur H. Squier, 35 T.C. 950 (1961), taxpayer received 100% of the redemption, though he would have received only 63.3% of a dividend—a difference of 36.7%. In Abraham Frisch, 18 CCH Tax Ct. Mem. 358 (1959), taxpayers received 88.3% and 11.7%, respectively, on redemption, though they would have received 66.7% and 33.3% of a dividend—a difference of 21.6%. And just recently in Sorem v. Commissioner, 334 F.2d 275 (10th Cir. 1964), taxpayers each received 50% of the redemption, though they would have been deemed to have received 43.77% and 37.91% of a dividend—a difference of 6.23% and 12.09%. We need not consider whether the same conclusion would follow if the difference were only 7%, see Friend v. United States, 226 F.Supp. 814 (D.Mass.1964), or 8.7%, see Bradbury v. Commissioner, 298 F.2d 111 (1st Cir. 1962).

The Tax Court acknowledged the difference in result between the distribution here and a dividend but thought it unimportant because taxpayer was "the owner of such a heavy percentage of the distributing corporation's stock * *" 41 T.C. at 71. But the cases relied on by the Tax Court are very different from the one before us. In Bradbury only 8.7% of the distribution would have gone to the other shareholders were it a dividend, and 91.3% of all shares were considered owned by the taxpayer. Moreover, even without attribution taxpayer was the controlling shareholder. And in Keefe v. Cote, 213 F.2d 651 (1st Cir. 1954), taxpayer owned over 99% of all shares and would have received all of any dividend save a fraction of 1%. Indeed, there a "legitimate business purpose"

was found adequate to bar dividend equivalency. Lastly, in both cases only common stock existed so that all essential shareholder relationships existed pro rata with dividend rights.

The Tax Court also stressed the fact that the redemption effected no change in voting power. Of course, this could be relevant if only common stock existed; but where nonvoting stock exists redemption even of all of it cannot affect voting power. Since nonvoting preferred was redeemed here we do not think such weight should have been given to the absence of any change in voting power. However, were voting shares redeemed we think that the Tax Court's lumping together of common and voting preferred would have been justifiable, if only to gauge the impact on voting power.

However, the Tax Court also stressed the fact that taxpayer's total ownership of all shares was reduced only 2.74% by the redemption, a change not thought substantial. But this figure was obtained by lumping together all shares outstanding—common, voting preferred, and nonvoting preferred. We think that such a figure is not particularly helpful. It cannot stand in the abstract, but must be related to some significant aspect of the complex of shareholder rights. The Tax Court did not indicate any such relationship and we are not convinced that necessarily there is any in a corporation having several differently defined classes of stock. The figure does not relate to voting power. It does not relate to rights to share in earnings. It might be thought to relate to rights on liquidation, but it does not accurately do that either.

Taxpayer urges us to consider the changes in relative shares of net worth attributable to each shareholder. Some courts have looked to these changes in book value of a shareholder's total holdings in order to assess the effect of the distribution on liquidation rights. See, e. g., Abraham Frisch, supra. We agree that it is a proper inquiry. The test has not been extensively developed, however, perhaps because relatively few of the cases have involved even two classes

·of stock,[6] and none that we have found has involved three classes, as are present here. Of course with only one class there is no need to turn to a net worth test since liquidation rights, like the other ˋbasic shareholder rights, will exist in ·direct proportion to shares held.

Taxpayer asserts, and the Commissioner did not contend otherwise, that the effect of the distributions was to re·duce his share of net worth from 62% to 57%—a difference of 5%. We cannot say that this difference is so insub·stantial as to make the redemptions "es·sentially equivalent to a dividend." To place the changes in context we note that with redemption of the last shares held by taxpayer—either in one complete re·demption or as the culmination of a series the last of which would perforce be a ·"complete" redemption—his sons' shares would no longer be attributed to him since on these facts his interest in the company would be terminated. Sections 302(b) (3), 302(c) (2). Prior to any redemption, the preferred itself represented only 22% of the net worth as of December 31, 1957. Thus, for taxpayer, the maximum possible share of net worth that could be affected by a redemption was 22%, not the 62% attributed to him through section 318. A change of 5% should be compared with this lesser figure.[7]

In fact, taxpayer would also have us support our conclusion by finding, contrary to the Tax Court, that the redemptions were part of an overall plan to terminate his interest in the corporation. However, we do not feel compelled to reach the question. The parties also dispute whether the initial advances by taxpayer constituted debt or equity capital. Cf. 1964 Wis.L.Rev. 331. Given our view of the case, it makes no difference and we do not decide the question.

The decision of the Tax Court is reversed.

6. Sec, e.g., Ballenger v. United States, 301 F.2d 192 (4th Cir. 1962); Cobb v. Callan Court Co., 274 F.2d 532 (5th Cir. 1960); Bullock v. Commissioner, 253 F.2d 715 (2d Cir. 1958), affirming on the opinion below 26 T.C. 276 (1956); Northup v. United States, supra; Friend v. United States, supra; Robert H. Herzog, 22 CCH Tax Ct. Mem. 1595 (1963); Abraham Frisch, supra; Henry A. Goldwynne, 26 T.C. 1209 (1956). Equivalency was found only in Ballenger and Friend.

7. We think it quite proper to be aware of the effect of a distribution on significant corporate interests without strict regard to the attribution rules. Cf. Moore, Dividend Equivalency—Taxation of Distributions in Redemption of Stock, 19 Tax L.Rev. 249, 252–55 (1964); Note, Stock Redemptions From Close Family Corporations Under Section 302, 47 Minn. L.Rev. 853, 867–70 (1963).