DON G. FURR and MARION D. FURR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Furr v. Commissioner
Docket No. 2034-73.
United States Tax Court
T.C. Memo 1975-84; 1975 Tax Ct. Memo LEXIS 285; 34 T.C.M. (CCH) 426; T.C.M. (RIA) 750084; March 31, 1975, Filed Wentworth T. Durant, for the petitioners. Tom G. Parrott, for the respondent. SCOTT MEMORANDUM OPINION
SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the taxable year ended December 31, 1970, in the amount of $ 9,713.20. The only issue for decision is whether the transfer of 16 shares of nonvoting common stock of Furr Realty Company by petitioner Don Furr to a related corporation, within the meaning of section 304, I.R.C. 1954, [1] Furr's, Inc., for satisfaction of an indebtedness and cash is a distribution to Don Furr which is to be treated as in payment for the transferred stock under section 302(a). *289 All the facts have been stipulated and are found accordingly. Petitioners Don and Marion Furr, husband and wife, who resided in Lubbock, Texas at the time of the filing of their petition in this case, filed their joint Federal income tax return for the taxable year 1970 with the district director of internal revenue at Austin, Texas on the cash receipts and disbursements method of accounting. Don Furr (hereinafter referred to as petitioner) owned stock in Furr Realty Company (Realty), all of which had been acquired by him from his father as a gift during the calendar year 1948. Realty and Furr's, Inc. (Company) are Texas corporations. On April 8, 1970, petitioner transferred 16 shares of Class B nonvoting common stock of Realty to Company for a total consideration of $ 27,837.76 which was discharged by the cancellation of his indebtedness to Company of $ 27,131.27 and the issuance to him of Company's check for $ 706.49. Immediately prior to this transfer, the outstanding stock of Realty was owned as follows: Class A
Class B
Voting
Percent
Nonvoting
Percent
Stockholder
Common Stock
Ownership
Common Stock
Ownership
Don Furr
2
4.26
31
3.3
Don Furr's parents
32
68.08
352
37.9
Company
0
0
124
13.4
All other
stockholders
13
27.66
421
45.4
Total shares
outstanding
47
100.00
928
100.0
*290 Immediately after this transfer, the outstanding stock of Realty was owned as follows: Class A
Class B
Voting
Percent
Nonvoting
Percent
Stockholder
Common Stock
Ownership
Common Stock
Ownership
Don Furr
2
4.3
15
1.6
Don Furr's parents
32
68.1
352
37.9
Company
0
0
140
15.1
All other
stockholders
13
27.6
421
45.4
Total shares
outstanding
47
100.0
928
100.0
On April 8, 1970, the outstanding stock of Company was owned as follows: Class B
Class A
Preferred
Percent
Voting
Percent
Nonvoting
Percent
Stockholders
Stock
Ownership
Common
Ownership
Common
Ownership
Stock
Stock
Don Furr
201
10.5
300
2.1
9,030
5.70
Don Furr's
Parents
695
36.1
10,130
69.8
28,293
17.80
Don Furr's
Children
0
0
0
0
110
.06
Don Furr's
Spouse
0
0
0
0
55
.03
Realty
0
0
0
0
1,925
1.21
All Other
Stockholders
1,027
53.4
4,090
28.1
119,526
75.20
Total Shares
Outstanding
1,923
100.0
14,520
100.0
158,939
100.00
The preferred stock of Company had a value of $ 100 per share on April 8, 1970, and the outstanding Class A and Class B common *291 stock of Company had a book value of $ 55 per share on April 8, 1970. On December 7, 1970, Realty redeemed two shares of its Class A voting common stock and 15 shares of its Class B nonvoting common stock owned by petitioner for a total consideration of $ 29,577.62. These 17 shares of Realty stock constituted all of the outstanding stock of Realty actually owned by petitioner on December 7, 1970. Immediately after the December 7, 1970, redemption of petitioner's stock, the stock of Realty was owned as follows: Class A
Class B
Voting
Percent
Nonvoting
Percent
Stockholder
Common Stock
Ownership
Common Stock
Ownership
Don Furr
0
0
0
0
Don Furr's parents
32
71.1
352
38.8
Company
0
0
140
15.4
All other
stockholders
13
28.9
416
45.8
Total shares
outstanding
45
100.0
908
100.0
On April 8, 1970 and December 7, 1970, the outstanding Class A and Class B common stock of Realty had a value of $ 1,739.86 per share. On December 7, 1970, the outstanding stock of Company was owned as follows: Class B
Class A
Preferred
Percent
Voting
Percent
Nonvoting
Percent
Stockholder
Stock
Ownership
Common
Ownership
Common
Ownership
Stock
Stock
Don Furr
201
10.5
300
2.1
9,030
5.6
Don Furr's
Parents
695
36.1
10,130
69.8
28,293
17.5
Don Furr's
Children
0
0
0
0
110
.07
Don Furr's
Spouse
0
0
0
0
55
.03
Realty
0
0
0
0
1,925
1.2
All Other
Stockholders
1,027
53.4
4,090
28.1
122,313
75.6
Total Shares
Outstanding
1,923
100.0
14,520
100.0
161,726
100.0
*292 On December 7, 1970, the outstanding Class A and Class B common stock of Company had a book value of $ 52.99 per share and its preferred stock had a value of $ 100 per share. At the end of the taxable year 1970, Company had accumulated earnings and profits in the amount of $ 5,174,146.06. During calendar year 1970, Company did not purchase or acquire any Realty stock other than the 16 shares of Class B nonvoting common stock acquired from petitioner on April 8, 1970. During the calendar year 1970, Company did not make any distributions of cash or property to its stockholders which were designated as dividends. During the calendar year 1970, in addition to the 15 shares of Class B nonvoting common stock and two shares of Class A voting common stock redeemed from petitioner, Realty redeemed five shares of Class B nonvoting common stock from Robert Boverie and did not redeem or otherwise acquire any other shares of either of these classes of stock in that year. Realty in the calendar year 1970 did not make any distribution in cash or property to any stockholders other than petitioner and Robert Boverie. On July 7, 1972, petitioner Don Furr mailed a letter to the district director *293 of internal revenue at Dallas, Texas, which stated as follows: I was the owner of 17 shares (certificate #60, #61, & #16) of the capital stock of Furr Realty Company, Box 1650, Lubbock, Texas. This stock was acquired by me at the date of organization of the corporation on August 9, 1948, for cash. The 17 shares represent an interest of 1.7% of the total issued and outstanding stock of the corporation. On December 7, 1970, the corporation redeemed the 17 shares for a total payment of $ 29,577.62. The cost to me at organization was $ 1,700.00. The recognized capital gain of $ 27,877.62 is reported on form 1040 and timely filed. Since December 7, 1970, I have not acquired an interest in the corporation and since December 21, 1970, the date of my resignation as a Board Member, I have not been a director, officer or employee and, if I acquire such interest within a period of ten years from December 7, 1970, I will within 30 days after such acquisition notify the District Director of Internal Revenue Service of such acquisition. Petitioner and his wife reported the transfer of 16 shares of Class B nonvoting common stock of Realty to Company on their 1970 joint Federal income tax *294 return as a sale of stock resulting in long-term gain in the amount of $ 26,237.76. Respondent in his notice of deficiency increased petitioners' income as reported by $ 14,718.88 with the following explanation: It is determined that $ 27,837.76 received from Furr's, Inc. in exchange for 16 nonvoting shares of Furr Realty Company was, under provisions of Internal Revenue Code Sections 304, 302 and 301, a stock redemption distribution equivalent to a dividend and taxable as ordinary income. Reported taxable income is increased as follows: Unreported dividend
income
$ 27,837.76
Less reported taxable
capital gain
13,118.88
Increase reported
income
$ 14,718.88
As a general rule, distributions of property by a corporation to a shareholder are treated under sections 301 and 316 as dividends to the extent of the corporation's earnings and profits. Section 302(a) provides that in the case of a redemption of stock within the meaning of section 317(b) where one of the four subparagraphs of section 302(b) applies the distribution shall be treated *295 as "payment in exchange for the stock." [2]
*296 Section 304(a)(1) provides that for the purposes of section 302 if a person is in control of each of two corporations and one of these corporations acquires stock in another corporation from that person in return for property, the distribution shall be treated as a distribution in redemption of stock of the acquiring corporation. Section 304(b)(1) provides that in case of an acquisition to which section 304(a) applies, the determination of whether the acquisition is to be treated as in exchange for the stock shall be made by reference to the stock of the issuing corporation. Section 304(c) provides that if a person after applying the attribution rules of section 318(a) owns at least 50 percent of the voting power of all classes of stock entitled to vote of a corporation, that person shall be in "control" of that corporation for the purposes of section 304(a). [3]
*297 Petitioner in this case recognizes that he owned over 70 percent of the voting power of both Realty and Company after applying the attribution rules of section 318(a) and therefore section 304 applies to petitioner's transfer of 16 shares of Realty stock to Company on April 8, 1970. Petitioner further recognizes that for determination of whether the acquisition is to be treated by reason of section 302(b) as a distribution in payment in exchange for his stock, reference must be had to the stock of Realty. Petitioner's primary position is that the redemption meets the requirement of section 302(b)(1) of being "not essentially equivalent to a dividend." In the alternative, petitioner contends that since, as of the end of 1970, he completely terminated his actual ownership in the "redeeming" corporation (Realty) and filed an appropriate agreement to effect a waiver of the family attribution rules, the provisions of section 302(b)(3) are satisfied. Petitioner argues that the transfer of his 16 shares should be characterized as not essentially equivalent to a dividend within the meaning of section 302(b)(1), since (1) applying the "comparative dividend" test delineated in Himmel v. Commissioner,338 F. 2d 815 *298 (C.A. 2, 1964), reversing 41 T.C. 62 (1963), the distribution to him was nonprorata since he received a greater amount than he would have received had the total distribution been a dividend on the common stock outstanding, and (2) in terms of reduction in net worth in Realty, his actual ownership due to the redemption was decreased by 45.56 percent without application of the attribution rules of section 318(a). Respondent contends that the decision in United States v. Davis,397 U.S. 301 (1970), established as the test of nondividend equivalency whether the taxpayer incurred "a meaningful reduction of [his] proportionate interest in the corporation." Respondent contends that, applying the attribution rules of section 318 as required by the Davis case, the net effect of the distribution to petitioner was essentially equivalent to a dividend. Respondent points out that petitioner's voting control was unchanged by the transaction, his net worth was only minimally reduced, and his rights to future earnings and assets in liquidation were reduced by only about 1.23 percent. [4] Respondent submits that this 1.23 percent reduction of petitioner's *299 ownership of a minority interest in nonvoting stock by one who owns directly and indirectly a 72.34 percent voting interest in the same corporation does not constitute a meaningful reduction as required by Davis.
In Himmel v. Commissioner,supra, upon which petitioner places his main reliance, the Appeals Court considered the fact that the taxpayer received considerably more in the distribution than his share of a common stock *300 dividend to be indicative of a sale of the stock. However, that court also considered a number of other factors, including business purpose, the reduction in each shareholder's net worth, and relative changes of each one's (a) voting rights, (b) rights to share in corporate earnings, and (c) rights to a share of the corporation's assets upon liquidation. All these considerations composed what was referred to by the court as the "strict net effect" test. In Himmel, the court emphasized not only that the distribution was not pro rata among the shareholders, but also that the "redeemed" shareholder's relationship to the corporation and other shareholders was effected, stating (338 F. 2d at 817-818): The hallmarks of a dividend, then, are pro rata distribution of earnings and profits and no change in basic shareholder relationships. Too frequently the inquiry in § 302(b) cases does not keep this sufficiently in mind. Existence of a pro rata distribution may be determined by comparing the patterns of distribution to see whether the shareholders received the same amount as *301 they would have received had the total distribution been a dividend on the common stock outstanding. But, aside from a singleshareholder corporation, it is not enough merely that the taxpayer received the same amount as he would have received with a dividend, for that could be the result of a sale of some stock to a third party. Rather, pro rata distribution indicates also, at least in a one-class capital structure, the extent to which -- if any -- the basic rights of ownership have been affected. Where there is only common those rights would exist in proportion to shares held. Therefore, quite often the net effect of a distribution may adequately be gauged by determining what would have been the pattern with a dividend. [Footnote omitted.] In our view the Himmel case stressed equally that for a redemption not to be essentially equivalent to a dividend it must change the relative economic interest or rights of ownership as well as being disproportionate to stock ownership. In other words, while a pro rata distribution of earnings will usually be taxable as a dividend, section 1.302-2(a), Income Tax Regs. *302 , the absence of a pro rata distribution is not conclusive that a distribution is not a dividend. See James F. Boyle, 14 T.C. 1382, 1389 (1950), affd. 187 F. 2d 557 (C.A. 3, 1951), cert. denied 342 U.S. 817 (1951). Other cases relied on by petitioner also indicate that the Himmel case is not predicated solely on the disproportion of the distribution among common stockholders. In Levin v. Commissioner,385 F. 2d 521 (C.A. 2, 1967), affirming 47 T.C. 258 (1966), cited by petitioner as supporting his position, the court stated, citing Himmel, that it had relied "primarily on changes in 'basic rights of ownership'" in determining whether a distribution was not essentially equivalent to a dividend. Our interpretation of the Himmel case is that even when the distribution is disproportionate as to all common stockholders after applying the attribution rules of section 318(a), the redemption must also result in a change in the basic ownership rights after applying the attribution rules of section 318(a) for the distribution to be not essentially equivalent to a dividend. However, if this is not the *303 proper interpretation of Himmel, then the contrary holding of Himmel would be in conflict with the holding of the Supreme Court in United States v. Davis,supra, and therefore would no longer be viable. In the Davis case the Supreme Court specifically stated (at 312) that "to qualify for preferred treatment under that section [sec. 302(b)(1)], a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation." Applying the holding of the Davis case to the instant case and taking into consideration the rules of attribution as required by the Davis case, petitioner owned 72.34 percent of the Class A voting common stock in Realty both prior to and after the redemption. He also owned 41.2 percent of the Class B nonvoting common stock before the redemption, without considering his pro rata holding of shares which were held by Company. After his transfer of 16 Class B shares to Company, he owned 39.5 percent of the Class B shares without consideration of the interest he held in shares of Company, a reduction in his ownership interest in the Class B nonvoting stock of only 1.7 percent after *304 applying the attribution rules of section 318(a). We have held a much greater reduction in interest in a corporation not to be "meaningful" within the holding of the Davis case where the dominant shareholder is not deprived of "his ability to control the corporate activities." Fehrs Finance Co.,58 T.C. 174, 185 (1972), affd. 487 F. 2d 184 (C.A. 8, 1973), cert. denied 416 U.S. 938 (1974). Here petitioner's voting control of Realty remained unchanged after the transfer. Petitioner argues that Stanley F. Grabowski Trust,58 T.C. 650 (1972), decided after the Davis case, supports his position. In that case, distributions to trusts in redemption of preferred stock were held essentially equivalent to a dividend where the beneficiaries were attributed with owning an 80.2 percent interest in the corporation's stock actually owned by their parents. The Court stated at 656: (1) the redemption caused no reduction in the trusts' proportionate constructive interest in Stanley Plating Co., Inc.; (2) had this distribution been *305 instead a dividend, the trusts would have received more than they did in the actual redemption; and (3) the redemption caused an increase in the trusts' constructive interest in the net worth of the company. In light of these results, therefore, we must conclude that the distributions in question were "essentially equivalent to a dividend" under section 302(b)(1) of the Code and the respondent's determination must be sustained. It is clear that although we did mention the distribution being less instead of more than a "hypothetical" dividend we also relied, in reaching our conclusion that the distribution had not been shown to be not essentially equivalent to a dividend, on the fact that the redemption caused no reduction in the trusts' proportionate interest in the corporation. In the Grabowski Trust case (58 T.C. at 659), we specifically refused to decide "whether compliance with the formula espoused in Himmel would necessarily satisfy the 'meaningful reduction of the shareholders' proportionate interest' requirement of Davis. It is enough that such compliance is a minimum condition established by Davis and that such condition has not been met." *306 In the Davis case the criterion for dividend equivalency is that the distribution which effects a transfer of property for stock from the corporation to a shareholder alters the shareholder's relative economic interest or shareholder rights in the corporation. Under the facts in the instant case, petitioner clearly did not meet this requirement of the Davis case, since the small percentage decrease in his proportionate ownership and rights in Realty Class B nonvoting stock is not meaningful. See Bernard E. Niedermeyer,62 T.C. 280 (1974). Here, as in the Niedermeyer case, petitioner's majority interest in Realty's voting common stock was not diminished by the "redemption," and the small diminution in other rights represented by the 16 nonvoting shares transferred did not effect a substantial change in his proportionate interest in Realty. At what point a distribution which was disproportionate to ownership of common stock might cause such a change in "the basic rights of ownership" of a shareholder in a corporation as to cause there to be a "meaningful reduction" in that shareholder's proportionate interest in the corporation as required by the Davis *307 case, we need not decide. Clearly under the facts here present, even though the distribution to petitioner was disproportionate to his ownership of common stock, as would be the situation with respect to many "redemptions" under section 304 of the stock of only one shareholder, this disproportionate distribution did not cause a "meaningful reduction" in petitioner's proportionate interest in Realty after application of the attribution requirements of section 318(a) which, as we stated in the Grabowski Trust case, is "a minimum condition established by Davis." Since we interpret the Davis case as requiring the application of the attribution rules of section 318, certainly in cases where, as here, there is no evidence of intrafamilial hostility to mitigate the application thereof, we have not discussed petitioner's argument that his "actual" reduction in interest in Realty without applying these attribution rules was greater rather than substantially less than the 5 percent reduction which occurred in the interest of the taxpayer in the Himmel case. Petitioner argues in the alternative that the April 8 "redemption" must be considered as a part of the later December 7, 1970, redemption *308 which terminated his interest in Realty since both occurred in the same year and therefore he meets the requirements of section 302(b)(3). Petitioner argues that multi-step transactions have been construed in the past as a single transaction qualifying as a complete termination of a taxpayer's interest, relying on such cases as In re Lukens' Estate,246 F. 2d 403 (C.A. 3, 1957), reversing Irwin G. Lukens,26 T.C. 900 (1956), where the first redemption greatly reduced a taxpayer's interest in a corporation and represented the "first step in an integrated plan to eliminate the taxpayer as a shareholder." Petitioner recognizes that there is not one scintilla of evidence in this fully stipulated case of any actual plan or even consideration of a "complete redemption" of all his stock in Realty on April 8, 1970, when he transferred 16 shares of his Class B nonvoting stock to Company. Rather, petitioner argues that since both "redemptions" occurred in one year, as a matter of law the two transactions should be considered as one. In Bernard E. Niedermeyer, supra at 290-292, we held that a transfer of stock on December 28, 1966, which terminated *309 the shareholder's interest in the corporation should not be considered to be "immediately after the September 8, 1966, redemption" so as to bring the transfer on September 8, 1966, within the provisions of section 302(b)(3) where the evidence failed to show a plan existed on September 8, 1966, to terminate the shareholder's interest. The situation in the present case is not distinguishable from that in the Niedermeyer case and we therefore hold against petitioner's contention on the basis of that case. Since we conclude that the April 8, 1970, transfer was not part of a plan for complete redemption of petitioner's interest in Realty, we need not decide whether, as respondent contends, under sections 304(b)(1) and 302(c)(2) petitioner continued to own stock in Realty through his continued ownership of stock in Company. Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954.↩
2. SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK. (a) General Rule.--If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock. (b) Redemptions Treated as Exchanges.-- (1) Redemptions not equivalent to dividends.--Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend. (2) Substantially disproportionate redemption of stock.-- (A) In general.--Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder. (B) Limitation.--This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote. * * * * * (3) Termination of shareholder's interest.--Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder. (4) Stock issued by railroad corporations in certain reorganizations.--Subsection (a) shall apply if the redemption is of stock issued by a railroad corporation (as defined in section 77(m) of the Bankruptcy Act, as amended) pursuant to a plan of reorganization under section 77 of the Bankruptcy Act. (5) Application of paragraphs.--In determining whether a redemption meets the requirements of paragraph (1), the fact that such redemption fails to meet the requirements of paragraph (2), (3), or (4) shall not be taken into account. If a redemption meets the requirements of paragraph (3) and also the requirements of paragraph (1), (2), or (4), then so much of subsection (c)(2) as would (but for this sentence) apply in respect of the acquisition of an interest in the corporation within the 10-year period beginning on the date of the distribution shall not apply.↩
3. SEC. 304. REDEMPTION THROUGH USE OF RELATED CORPORATIONS. (a) Treatment of Certain Stock Purchases.-- (1) Acquisition by related corporation (other than subsidiary).--For purposes of sections 302 and 303, if-- (A) one or more persons are in control of each of two corporations, and (B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control, then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation. * * * * * (b) Special Rules for Application of Subsection (a).-- (1) Rule for determinations under section 302(b).--In the case of any acquisition of stock to which subsection (a) of this section applies, determinations as to whether the acquisition is, by reason of section 302(b), to be treated as a distribution in part or full payment in exchange for the stock shall be made by reference to the stock of the issuing corporation. In applying section 318(a) (relating to constructive ownership of stock) with respect to section 302(b) for purposes of this paragraph, sections 318(a)(2)(C) and 318(a)(3)(C) shall be applied without regard to the 50 percent limitation contained therein. * * * * * (c) Control.-- (1) In general.--For purposes of this section, control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote, or at least 50 percent of the total value of shares of all classes of stock. If a person (or persons) is in control (within the meaning of the preceding sentence) of a corporation which in turn owns at least 50 percent of the total combined voting power of all stock entitled to vote of another corporation, or owns at least 50 percent of the total value of the shares of all classes of stock of another corporation, then such person (or persons) shall be treated as in control of such other corporation. (2) Constructive ownership.--Section 318(a) (relating to the constructive ownership of stock) shall apply for purposes of determining control under paragraph (1). For purposes of the preceding sentence, sections 318(a)(2)(C) and 318(a)(3)(C)↩ shall be applied without regard to the 50 percent limitation contained therein.
4. From the figures set forth in our findings it is apparent that after the April 8, 1970, transaction the actual ownership of Class B nonvoting common stock of petitioner and his parents was reduced by 1.7 percent. Respondent reaches the 1.23 percent by considering Company's stock ownership and making a complicated computation to adjust for the ownership of Realty and Company in the stock of each other. While respondent recognizes that the 1.23 percent decrease he arrives at is only approximate, he states that it is slightly on the high side. In our view the difference in a reduction of 1.7 and 1.23 percent in ownership of the nonvoting Class B stock of Realty is insignificant for the purposes of the issue in this case.↩