GEORGE O. GRANT AND DONNA J. GRANT, ET AL. [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Grant v. Commissioner
Docket Nos. 8284-79, 8285-79, 8286-79.
United States Tax Court
T.C. Memo 1982-480; 1982 Tax Ct. Memo LEXIS 267; 44 T.C.M. (CCH) 893; T.C.M. (RIA) 82480; August 18, 1982. *267 Held: A deposit received by G corporation was not received as an advance payment for the sale of goods, but was received as the purchase price for shares of its stock that were purportedly issued for security purposes only. G corporation is, therefore, not required to recognize any gain or loss upon receipt of the deposit. Held further: Distributions made by G Corporation in redemption of the stock of shareholders G and T are substantially disproportionate with respect to those shareholders, within the meaning of section 302(b) (2). Held further: Shareholder T has not met his burden of proof respecting the basis of his shares of G Corporation's stock. Peter Bartlett, for the petitioners. Thomas Tomashek, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Taxable Year
Income Tax
Docket No.
Petitioners
Ending
Deficiency
8284-79
George O. Grant
December 31, 1973
$30,403.82
and Donna J. Grant
8285-79
Glacier Bay
January 31, 1974
4,072.00
Seafoods, Inc.
8286-79
Harold W. Tobey
December 31, 1970
107.68
and E. Maxine Tobey
December 31, 1971
269.19
December 31, 1973
54,418.42
The three dockets have been consolidated *268 for purposes of trial, briefing, and opinion. As a result of concessions by the parties, the only issues remaining for our determination are (1) whether Glacier Bay Seafoods, Inc. must treat $350,000 that it received from Young's Seafoods, Ltd. as being received as an advance payment for goods and, therefore, include the $350,000 in its gross income for its fiscal year ending January 31, 1974; and (2) whether distributions made by Glacier Bay Seafoods, Inc. to George O. Grant and Harold W. Tobey in the amount of $127,377.59 each represent distributions of dividends to them. If we find that the distributions made by Glacier Bay Seafoods, Inc. are not taxable as dividends, we must also determine whether Harold W. Tobey's shares of Glacier Bay Seafoods, Inc.'s stock had a basis of $39,874.79 as of October 3, 1973. FINDINGS OF FACT Some of the facts in these cases were stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. George O. Grant (hereinafter Grant) and Donna J. Grant, husband and wife, filed a Federal income tax return for the taxable year 1973 with the Internal Revenue Service Center, Ogden, Utah. They resided *269 in Anchorage, Alaska, at the time their petition herein was filed. Petitioners Harold W. Tobey (hereinafter Tobey) and E. Maxine Tobey filed a Federal income tax return and two Applications for Tentative Refund from Carryback of Net Operating Loss or Unused Investment Credit (Form 1045) for the taxable year 1973 with the Internal Revenue Service Center, Ogden, Utah. They resided in Anchorage, Alaska, at the time their petition herein was filed. Glacier Bay Seafoods, Inc. (hereinafter Glacier) filed a Federal income tax return for its fiscal year ending January 31, 1974, with the Internal Revenue Service Center, Ogden, Utah. It also filed an amended tax return (Form 1120X) for its fiscal year ending January 31, 1974. At the time it filed its petition herein, Glacier's principal place of business was Ouzinkie, Alaska. Glacier was organized, under the laws of the State of Alaska in February 1972, for the purposes of operating a seafood processing plant and selling seafood products. After its inception, Glacier primarily produced shrimp and also produced other seafood products. Until October 3, 1973, Glacier had 50,000 shares outstanding owned by the following individuals: Number of
Name of Holder
Shares Held
Percentage
George O. Grant
20,750
41 1/2%
Harold W. Tobey
20,750
41 1/2%
Jane Yesenski
6,000
12 %
Baine Cater
2,500
5 %
50,000
100 %
*270 Glacier handled its own domestic sales. Its foreign sales, however, were handled by Glacier Bay Seafood Sales Corporation (hereinafter Sales). At all times relevant to this case, Sales' shareholders and the number of shares held by each of them corresponded exactly with Glacier's shareholders and the number of shares held by them. Sometime after October 3, 1973, Sales become qualified as a domestic international sales corporation (DISC), under section 992. [2]
The primary purchaser of Glacier's shrimp products was Young's Seafoods, Ltd. (hereinafter Young), which was located in London, England. Shortly after Glacier was formed, representatives of Young indicated their interest in either acquiring ownership of Glacier's seafood processing plant or participating in its ownership. Although Glacier refused to sell any ownership interest in the plant to Young at that time, it approached Young in 1973, when the market for shrimp had declined, proposing that it acquire an interest in the plant. Young orally agreed that it would purchase 50 percent of the stock of both Glacier and *271 Sales for $350,000. Accordingly, Glacier and Young entered into a written agreement, which was dated August 17, 1973, whereby Glacier promised to repurchase and cancel all of its outstanding stock, to reissue the stock as of September 15, 1973, and to deliver a certificate in the amount of 25,000 shares, representing 50 percent of Glacier's authorized capital stock, to Young. After the agreement was executed, Young learned that if it transferred the agreed purchase price of $350,000 for Glacier's stock outside the United Kingdom, it would incur what is referred to by the parties as a "penalty" equal to 20 percent of the purchase price. No such penalty, however, would be imposed if Young transmitted the funds as a deposit for goods to be purchased. Consequently, Tobey and Marvin Frankel (hereinafter Frankel), an attorney who practiced law in Alaska and represented Young there, engaged in discussions regarding alternative means by which the funds could be transferred by Young to Glacier without the penalty being imposed. As a result of those discussions, it was agreed between Glacier and Young, by teletypes dated September 14, 1973, and September 18, 1973, that the total deposit *272 of $350,000 would be recorded on the corporation's books "as a deposit on product which is permanent and not repayable." It was further agreed by those teletypes that Glacier and Sales would "secure this deposit by issuance to [Young] of 25,000 treasury shares [each] for security purposes only and a deposit agreement insuring [Young] 50 percent of the vote, profits, dissolutionment and three members on [the] board of directors, but never as an offset against shipments to [Young]." On October 3, 1973, a formal agreement that contained substantially the same terms as were agreed upon in the teletypes was executed by Glacier, Sales, and Young. Pertinent provisions of that agreement, in which Glacier and Sales are referred to as "Glacier", are as follows: 1. In consideration of the mutual covenants contained herein, Young agrees to deposit with Glacier $350,000 on or before October 3rd, 1973, as a non-refundable deposit.
2. Glacier agrees to issue to Young, for security purposes only, 25,000 shares of capital stock in each of Glacier's corporations. The parties agree that Young, holding these shares for security purposes only shall have the right to vote the shares, to profits, to participation *273 in dissolution, and all other incidents of stock ownership while this agreement is in effect. 3. The parties acknowledge that the deposit made by Young shall never be used as a credit against shipment by Glacier to Young. 4. Glacier represents and warrants that: c. Twenty five thousand (25,000) shares issued by each Glacier corporation for security purposes only shall represent 50% of the outstanding stock of each corporation; no additional shares shall be issued without unanimous consent of the Board of Directors. 5. Young acknowledges that, as of the effective date of this agreement there are to be no corporate cash balances. 6. The parties acknowledge that of the $350,000.00 deposit made by Young, the sum of $114,750.00 is to be used to acquire capital stock from certain present stockholders, and $28,600.00 is to be used to reimburse Glacier for the down payment on the boat Cloverleaf, dock hoist, and ice plant and miscellaneous equipment.
8. All agreements, representations and warrantees [sic] made herein shall survive the execution of this agreement and the delivery of the shares for security purposes. 10. The certificates delivered to Young shall bear a legend [in] *274 substantially the following form: "The shares represented by this certificate may not be transferred in that they are issued for security purposes only." 11. The parties acknowledge that no capital expenditures in excess of $10,000.00 are to be made without unanimous consent of the Board of Directors. 12. The parties acknowledge that no additional capital stock of Glacier is to be issued without unanimous consent of the Board of Directors. 13. Shareholders, Cater, Grant and Tobey shall be entitled to have the right of first refusal to purchase each others stock. Such right must be exercised in writing within 30 days on the terms and conditions offered by any outside party. Young shall have the right of second refusal to purchase any such shares on the same terms as set out above. If any of the shares so offered are not accepted within the periods prescribed, the offeror shall be free from the provisions of this agreement, provided however, that if any such shares are thereafter acquired by any shareholder who is a party to this agreement, such shares shall be subject to all the provisions of this agreement. All shares of the corporation shall have endorsed the following: "The *275 shares represented by this certificate are subject to the terms of an agreement dated October 3, 1973, between Glacier and Young." Also on October 3, 1973, Glacier and Sales entered into a deposit agreement with Young, as they had agreed to do in the previously mentioned teletypes.The deposit agreement also provides that Glacier shall issue 25,000 shares of capital stock to Young "for security purposes only" and that Young shall have the right to vote such shares, the right to share in profits, the right to participate in dissolution, and "all other incidents of stock ownership while this agreement is in effect." It further provides that out of the $350,000 deposited by Young, "$114,750.00 is to be used to acquire capital stock from certain present shareholders." Upon receipt of the $350,000 from Young, it was intended that Glacier, in order to have 25,000 shares that it could then issue to Young, redeem Yesenski's 6,000 shares and Cater's 2,500 shares and also acquire shares held by Grant and Tobey. Yesenski and Cater were to receive $13.50 per share each, or $114,750 in total (8,500 shares X $13.50). Tobey had determined by "roughly pencil[ing] out some figures" that $13.50 per *276 share was a "reasonable figure" to pay for the shares of Yesenski and Cater. Yesenski, accordingly, received $81,000 from Glacier for her 6,000 shares. Cater, however, refused to sell his shares. Upon Glacier's receipt of the $350,000, Tobey and Grant received $127,377.59 each from Glacier; $16,875 of the amount received by each was received in exchange for 1,250 shares acquired by Glacier from each, which were to substitute for the 2,500 shares that were to have been acquired by Glacier from Cater. Grant computed the remaining amount to be distributed by Glacier to Tobey and to him. He computed the amount under a method which, in his opinion, reflected a formula that had been agreed upon by Young. First, he reconciled Glacier's bank accounts to determine the amount of cash in its accounts as of October 1, 1973. Then, he added to such amount the total amount of "bona fide" accounts receivable due to Glacier as of October 1, 1973, subtracted from it the total amount of accounts payable owed by Glacier as of October 1, 1973, and made further adjustments to it for the amount of certain purchases made by Glacier, at Young's direction, between August 15, 1973, and October 1, 1973. *277 As a result of Grant's computations, $110,502.59 was distributed by Glacier to each of the individual petitioners herein. Grant and Tobey on October 3, 1973, each surrendered to Glacier his stock certificate for 20,750 shares and each received a new certificate for 11,250 shares of Glacier's stock. Young, also on October 3, 1973, received a stock certificate for 25,000 shares of Glacier's stock, bearing a legend indicating that the shares were issued for security purposes only. As provided by paragraph 13 of the agreement previously set out, the following statement is inscribed on the back of the stock certificate: The shares represented by this certificate are subject to the terms of an agreement dated October 3, 1973, between Glacier and Young. As a result of the foregoing transactions, on and after October 3, 1973, Tobey and Grant held 11,250 shares each of Glacier's common stock, Cater held 2,500 shares of its common stock, and Young held its remaining 25,000 shares, allegedly for security purposes only. On October 3, 1973, a special meeting of stockholders of Glacier was held in Anchorage, Alaska. The minutes of that meeting indicate "Norman Young (Young's Seafood, Ltd.)," *278 as a shareholder of the corporation, was present. At the meeting, resignations were presented of all the former officers and directors of Glacier and an election was held for new directors to hold office until the annual meeting of stockholders. The new board of directors was composed of Norman Young, William H. Miles, Edwin D. Young, George O. Grant, Baine Cater, and Harold W. Tobey. [3]
At the first meeting of the new directors, also held on October 3, 1973, "it was RESOLVED, that as of the 1st day of October, 1973, Glacier Bay Seafoods, Inc.'s stockholders, including Young's Seafoods, Ltd. would share the profits from October 1st, 1973." The new directors also elected new officers, including Norman Young as vice-president. Young had an international letter of credit issued by Barclay's Bank. Each time Glacier shipped a van of products to Young, it would bring the bill of ladings relating to the shipment to its bank in Anchorage, and receive an immediate deposit to its account, through the letter of credit. Subsequent to Glacier receiving the *279 deposit of $350,000 from Young, all sales by Glacier to Young continued to be paid for by the letter of credit. Young never received for its deposit any credit against the purchase price of goods. For approximately one month in 1974, Grant engaged in negotiations with Joseph P. Llanos (hereinafter Llanos) regarding the sale of all his stock in Glacier and in Sales to Llanos. During the course of the negotiations, Llanos and his wife, who was a book-keeper, stayed at Glacier's seafood processing plant for 10 days, observing the operation of the plant and examining Glacier's books and records. Sometime in October 1974, Grant reached an agreement with Llanos respecting the sale of his stock to Llanos. On November 2, 1974, Grant and Llanos executed a document entitled "Temporary Agreement of Sale," in which Grant agreed to sell his 11,250 shares in Glacier and in Sales to Llanos. That document contains no indication as to the percent of Glacier's shares outstanding represented by Grant's 11,250 shares. Subsequently, Llanos gave the "Temporary Agreement of Sale" to his attorneys, who were members of the same law firm which represented Young, and asked them to prepare a formal stock *280 purchase agreement from it. The agreement that Llanos' attorneys composed states that Grant's 11,250 shares of Glacier and of Sales represent 45 percent of the outstanding stock of each company. Grant and Llanos executed that agreement. By letter dated February 25, 1975, Paul F. Robison, an attorney who was connected with the same law firm as Frankel, demanded on behalf of Young that Grant and Tobey return $63,385 each to Glacier. The letter stated that Tobey and Grant had each withdrawn, in October 1973, $63,385 more than the amount that was intended to be distributed to them. The demand for these funds was made because Young disagreed with the computation that Grant had made to determine the amount to be distributed. The dispute concerning the funds continued for at least 5 months. During that time, Tobey advised Young that if there was a proper accounting, he would repay any funds that he owed. From the inception of Glacier until Grant sold his shares of its stock to Llanos, Grant operated its seafood processing plant. After Llanos purchased the shares, he began to operate the plant, but then he desired to start an electrical contracting company. Consequently, he ceased *281 managing Glacier's plant. Thereafter, Glacier was unable to find competent management for the plant and, as a result, it became financially troubled. Apparently on account of Glacier's financial difficulties, Young became interested in selling the Glacier shares which it held. By letter dated August 13, 1975, Norman Young on behalf of Young advised Llanos, "As I have previously suggested to Harold Tobey, we would be prepared to sell all or part of our shareholding if this would help your situation in any way." By teletype dated August 22, 1975, Edwin Young notified Tobey that Young had commenced "discussions with a U.S.A. Company. Idea being they buy our shareholding in Glacier Bay * * *." Young, however, failed to sell their "shareholding" in Glacier in August 1975. Subsequently, Tobey thought that if he could acquire all of Glacier's stock, he would be able to successfully operate its plant. In this connection, he had discussions with Young's representatives respecting Young exchanging the shares held by it for a debenture issued by Glacier. On October 2, 1975, Young and Glacier executed a written agreement in which Young promised to surrender its shares of Glacier stock in *282 exchange for a debenture in the amount of $350,000, plus interest at the rate of 6 percent. The legal department of Young's parent company objected to the agreement on the ground that it contained a provision which suggested that there was a responsibility on the part of Glacier's shareholders to insure that its creditors were paid. [4] The agreement therefore, was revised so as to eliminate that provision. The new agreement was signed by Norman W. Young on behalf of Young. The following provisions appear in both the original and revised agreements: WHEREAS, a substantial shareholder, HAROLD W. TOBEY, has outlined a program for restructuring and refinancing Glacier Bay in such manner as to put said company on a sound financial and operating basis, pursuant to which he has secured options to purchase all other outstanding shares of common stock of Glacier Bay, save and except those currently owned by Young's, and WHEREAS, the aforesaid restructuring plan will require a change in relationship of the parties *283 hereto, if such plan is to be successful; THEREFORE, based upon the mutual promises, covenants and considerations, heretofore and hereafter expressed, the parties agree: 1. Young's shall tender to Glacier Bay all of its outstanding shares in Glacier Bay, and does hereby renounce its equity interest in the said company, other than its right to participate as may be hereinafter set forth. Before the shares held by Young were actually converted to a debenture, a fire occurred at Glacier's plant "which resulted in almost a total loss" of it. When Young learned about the fire, it reneged on the above agreement. Glacier, on its tax return for the fiscal year ending January 31, 1974, did not treat the $350,000 received by it from Young's as taxable income. Respondent determined that the $350,000 represented prepaid income for future sales and increased Glacier's taxable income accordingly. On the joint Federal income tax return which he filed for the year 1973 Tobey reported the $127,377.59 that he received from Glacier as being received in exchange for his stock as follows: Description
Date
Date
Gross Sales
Long-term
of Property
Acquired
Sold
Price
Basis
Capital Gain
9,500 shs.
2/72
10/73
$127,377.59
$30,000
$97,377.59
Glacier Bay
Seafoods
Respondent *284 determined that the entire $127,377.59 received by Tobey was taxable as ordinary income, rather than as long-term capital gain, on the ground that the distribution made by Glacier was a dividend. Respondent also determined that the distribution by Glacier to Grant was a dividend, which was taxable as ordinary income, and was, therefore, incorrectly reported by him as long-term capital gain. Based on that determination, he increased Grant's taxable income for the year 1973 by $82,026.59, computed as follows: Cash distribution
$127,377.59
Gain reported
[5] *285 $90,503.00
Less Section 1202 deduction
45,252.00
45,251.00
Dividend adjustment before dividend exclusion
$ 82,126.59
Dividend exclusion
100.00
Increase in taxable income
$ 82,026.59 Tobey now contends that as of October 3, 1973, the basis of his stock was $39,874.79. In this connection, he offered the testimony of Phillip Cowart (hereinafter Cowart), a certified public accountant, who had worked with Glacier's books of account from approximately 1975 until 1978. Cowart neither maintained Glacier's books of accounts nor conferred with those who did so. He testified that from examining certain pages of Glacier's general journal, general ledger, and cash receipts journal, he concluded that Tobey's basis for his stock, as reflected by the corporate records, was either $26,674.47 or $39,874.79. Copies of the pages upon which Cowart relied in attempting to determine the basis of Tobey's stock have also been submitted to show its basis. OPINION The issues remaining for our decision are whether the $350,000 payment that Glacier received from Young was *286 an advance deposit for goods, which must be included in its taxable income for its fiscal year ended January 31, 1974, and whether the distributions in the amount of $127,377.59 received from Glacier by Tobey and Grant are taxable to them as dividends. If the distributions by Glacier to Grant and Tobey are not taxable as dividends, we must also determine whether Tobey has established that the basis for his shares of Glacier stock as of October 3, 1973, was $39,874.79. Young's Payment to Glacier
Where a taxpayer actually receives advance payments, over which he has unrestricted control, for the sale of goods in the ordinary course of his business, such payments are includable in his gross income upon their receipt. S. Garber, Inc. v. Commissioner,51 T.C. 733, 736 (1969) (advance payments received from customers for fur garments); Hagen Advertising Displays, Inc. v. Commissioner,47 T.C. 139, 145-146 (1966), affd. 407 F.2d 1105 (6th Cir. 1969) (advance payments made by customers for advertising signs). Respondent asserts that the $350,000 received by Glacier from Young was received as an advance payment for goods and is, accordingly, includable in Glacier's gross income in the year *287 in which it was received. Glacier argues that the $350,000 was not received by it as an advance deposit for the sale of goods, but, instead, was received as a contribution to its capital in exchange for an equity interest in Glacier. In support of his assertion that the $350,000 received by Glacier represents an advance deposit for goods, respondent refers us to the agreement executed on October 3, 1973, by Glacier, Sales, and Young. He particularly points to those provisions of it that indicate that Young agreed to deposit $350,000 with Glacier as a "non-refundable deposit" and Glacier agreed to issue 50 percent of its outstanding stock to Young's "for security purposes only." Respondent (after recognizing that this Court has not adopted the rule enunicated in Commissioner v. Danielson,378 F.2d 771, 775 (3rd Cir. 1967)) argues that Glacier is bound by the terms of that agreement because it has not adduced "strong proof" to show that the substance of what transpired was different from the form of the agreement, citing Schmitz v. Commissioner,51 T.C. 306, 316-318 (1968), affd. sub. nom. Throndson v. Commissioner,457 F.2d 1022, 1025 (9th Cir. 1972) and Hummel v. Commissioner,T.C. Memo. 1970-341, *288 affd. per curiam by an unreported opinion (9th Cir. 1973 32 AFTR2d 73-5333, 73-2 USTC par. 9595). When the parties to an agreement have clearly and unambiguously set out the terms of their agreement, a party to the agreement indeed must adduce strong proof to demonstrate that the true agreement of the parties is other than the language of the written agreement indicates. Stephens v. Commissioner,60 T.C. 1004, 1012 (1973), affd. without opinion, 506 F.2d 1400 (6th Cir. 1974); Schmitz v. Commissioner,supra at 318. However, where the agreement contains ambiguities or discrepancies, the surrounding facts and circumstances must be considered to determine the substance of their agreement. Peterson Machine Tool, Inc. v. Commissioner, 79 T.C.     (July 14, 1982); Ciaio v. Commissioner,47 T.C. 447, 461 (1967). [6]
In the present case, the October 3, 1973, agreement contains no language expressly stating that the $350,000 received by Glacier from Young is an advance payment for the sale of goods. Rather, the agreement provides (at paragraph 3), "The parties acknowledge that the deposit made by Young shall never be used as a credit against shipment *289 by Glacier to Young." [7] Further, the agreement fails to explain specifically what the payments shall "be used as a credit against." Accordingly, this case is an appropriate one in which to consider all the evidence relating to the agreement of the parties. In looking initially to the face of the agreement, we think that respondent, by relying on the term "deposit" (in paragraph 1) therein, rests his case on a weak foundation. Although a deposit of money may be made as an advance payment for goods, deposits are frequently made for other purposes. For example, money placed in a bank or given as security for performance of a contract is ordinarily considered to be deposited. We, consequently, ascribe no significance to the term "deposit" standing alone. As noted, an advance deposit received for the sale of goods is income upon receipt. We do not believe that the amount in question was such an advance deposit. Tobey testified to the effect *290 that the deposit was never credited against the price of goods purchased by Young and that Young paid for all goods purchased from Glacier by letter of credit, and we have so found.
We note that the documentary evidence submitted corroborates Tobey's testimony that the deposit was not treated as an advance payment for goods. Teletypes transmitted to Young on September 13, 1973, and September 14, 1973, by Frankel and Tobey, respectively, indicate that the deposit was not intended to be used as an offset against shipment. The teletype transmitted by Tobey states, "All sales would be handled by letter of credit as presently done." Moreover, as earlier noted, it was agreed by Young and Glacier in October 1975 that the shares held by Young would be converted into a debenture in the amount of $350,000, plus interest at the rate of 6 percent. This fact demonstrates to us that the amount of $350,000 deposited by Young was not applied against the price of goods purchased by Young, but rather was still intact in October 1975. We find that the $350,000 in question was not received as an advance deposit for goods, but, instead, as indicated infra, was received as the purchase price for the 25,000 *291 shares of Glacier's stock that were purportedly issued for security purposes only. We, therefore, hold that Glacier was not required to recognize any gain or loss upon the receipt of the money, under section 1032(a). [8]
Distributions to Grant and Tobey
As a general rule, any distribution of property made by a corporation with respect to its stock is taxable as a dividend to the recipient, to the extent of the corporation's earnings and profits. Sections 301(a) and (c) and 316(a). Section 302(a) provides an exception to that general rule where a corporation redeems its stock. See section 302(d). If the redemption qualifies under either section 302(b)(1), (2), or (3), [9] *292 *293 it is treated as being in part or full payment in exchange for its stock. Since stock is generally a capital asset, any gain realized on the deemed exchange will be capital gain. Section 1222. In order to qualify under section 302(b)(1), "a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation." United States v. Davis,397 U.S. 301, 313 (1970). Section 368(a)(1) defines the term "reorganization" to include a recapitalization. Under section 354(a)(1) and (2), no gain or loss is recognized by a stockholder in a corporation, which is a party to the reorganization, if pursuant to the plan of reorganization his stock *294 is exchanged solely for stock "in such corporation or in another corporation a party to the reorganization." However, section 354(a)(3) provides that if such shareholder in exchange for his stock receives any other property (commonly referred to as "boot"), he must refer to section 356 to determine the tax treatment of the exchange. Gain realized on the exchange, if any, is taxable to the shareholder to the extent of the "boot" received. Section 356(a)(1). Such gain is treated as a dividend, if the exchange "has the effect of the distribution of a dividend." Section 356(a)(2). In appropriate cases, the tests enunciated in section 302 may be useful for purposes of determining whether an exchange "has the effect of the distribution of a dividend," within the meaning of section 356(a)(2). See, e.g., Wright v. United States,482 F.2d 600, 605 (8th Cir. 1973). But cf. Shimberg v. United States,577 F.2d 283 (5th Cir. 1978) (not applying the principles of section 302 in a case involving section 356). Since our ultimate conclusion in the present case is that no reorganization occurred, it is unnecessary for us to consider the appropriate test to determine whether the distributions in *295 question are equivalent to a dividend under section 356(a)(2). Respondent contends that the transaction, which occurred on October 3, 1973, was a recapitalization, within the meaning of section 368(a)(1)(E), whereby Young received 25,000 shares of stock in Glacier for security purposes only. Thus, as he views the transaction, Tobey and Grant each surrendered 20,750 shares of Glacier's stock, which represented 41.5 percent of its outstanding stock preceding the transaction, in exchange for 11,250 shares of its stock, representing 45 percent of its stock after the transaction, and $127,377.59 in cash; accordingly, in his view, both Tobey's and Grant's proportionate interests in Glacier were increased as a result of the transaction.He, therefore, contends that such exchange had the effect of the distribution of a dividend, under section 356(a)(2), and the cash distributed to each of them should be taxed as a dividend. [10] *296 Petitioners claim that Young became the owner of the 25,000 shares transferred to it on October 3, 1973, and the redemption of their shares, therefore, was substantially disporportionate, under section 302(b)(2). If, as a result of the October 3, 1973, transaction, Young did not become the owner of the 25,000 shares transferred to it, then we must decide this issue for respondent. In that event, Glacier would be regarded as the owner of the 25,000 shares, which would be treated as treasury shares, and the proportionate interests of Tobey and of Grant in Glacier would have been increased. On the other hand, if Young did become the owner of the 25,000 shares transferred to it, then we must decide this issue for petitioners. Under those circumstances, Glacier would be considered to have had 50,000 shares of stock *297 outstanding after the transaction and the distributions in redemption of Grant's stock and Tobey's stock would be substantially disproportionate, within the meaning of section 302(b)(2). [11] Thus, we must confront the question of whether Young became the owner of the 25,000 shares transferred to it. The October 3, 1973, agreement is ambiguous on this point. The recital in *298 paragraph 2 to the effect that Young shall hold "the shares for security purposes only" supports respondent's position. However, the statement in paragraph 2 indicating that Young shall have "all other incidents of stock ownership" tends to establish that the stock was sold to Young. Paragraph 4(c) also contains contradictory language. First, it refers to the 25,000 shares being issued "for security purposes only," indicating that Glacier and Sales were pledging treasury shares. Then, it states that those shares "shall represent 50 percent of the outstanding stock of each corporation." As treasury shares, the shares would not have been outstanding. Since the contract is ambiguous respecting whether the transfer of the shares to Young constituted a sale, we will look beyond the form of the agreement to all available evidence to determine whether the shares, in substance, were sold to Young.
For purposes of Federal income taxation, the question of whether a person is the owner of property is a question of fact to be determined from all the facts and circumstances. Schoenberg v. Commissioner,302 F.2d 416, 418-419 (8th Cir. 1962), affg. a Memorandum Opinion of this Court; Snyder v. Commissioner,66 T.C. 785, 790-792 (1976). *299 In determining the owner of corporate stock, the critical factor is who has beneficial ownership of the stock as opposed to mere legal title of it. Yelencsics v. Commissioner,74 T.C. 1513, 1527-1529 (1980); Hoffman v. Commissioner,47 T.C. 218, 232-233 (1966), affd. 391 F.2d 930 (5th Cir. 1968). It is command over property and its economic benefits that constitute its beneficial ownership. Yelencsics v. Commissioner,supra.Ownership of common stock generally involves three important rights: (1) the right to vote, (2) the right to share in earnings, and (3) the right to share in net assets on liquidation.See Himmel v. Commissioner,338 F.2d 815, 817 (2nd Cir. 1964), revg. 41 T.C. 62 (1963). The substance of a transaction as opposed to its mere form is decisive of its tax consequences. Having considered the circumstances of the issuance of Glacier's shares to Young in light of the principles set forth in the above-cited cases, we are satisfied that in substance Young held the shares not as a mere pledgee, but as an owner. [12] *300 Petitioners have testified that the October 3, 1973, agreement was devised so as to avoid the "penalty" which would have been imposed by the United Kingdom if Young had received an out-right transfer of Glacier's shares. We find petitioners' explanation of the October 3, 1973 agreement credible. By the agreement, Young received precisely the same elements of ownership, other than legal title to the shares, as it would have received under the agreement executed on August 17, 1973. No documents make any reference to Young transferring funds to Glacier as an advance payment for goods or as a loan. No document limits the amount that Young is entitled to receive under the October 3, 1973, agreement from Glacier's profits or upon Glacier's dissolution or indicates that any such amounts received by Young shall *301 reduce a debt owed by Glacier to Young. No documents reflect those acts of Glacier that would constitute a default so as to permit Young to foreclose on the securities. In short, there is no evidence that the parties, in effect, intended to accomplish any different result by their October 3, 1973, agreement than by their August 17, 1973, agreement (other than avoid the "penalty"). Young clearly possessed all the attributes to stock ownership after October 3, 1973.A representative of Young, who voted the shares held by it, was present at shareholder meetings beginning on that date. Young had effective control of Glacier, since out of Glacier's six directors, three were its representatives. It was entitled to share in Glacier's profits derived on or after October 1, 1973, and to participate in its assets upon dissolution. The two October 1975 agreements, by which Young agreed to exchange the shares held by it for a debenture, also support petitioner's position. Those agreements indicate that Young was renouncing its "equity interest" in Glacier and that the Glacier stock held by Young was "owned by [it]." Considering that the legal department of Young's parent corporation reviewed *302 the original agreement and permitted the language quoted above to remain in the revised agreement, we think that such language demonstrates that Young regarded itself as owning the 25,000 shares of stock in Glacier which it held. Respondent argues that the description of Grant's percentage of ownership of the outstanding stock of Glacier and of Sales in the stock purchase agreement between Grant and Llanos totally ignores the stock held by Young and that such description, therefore, supports his position. As noted in our finding of facts, the stock purchase agreement indicates that Grant's 11,250 shares of Glacier and of Sales represented 45 percent of the outstanding stock of each company. [13] *304 Petitioners have, in our opinion, adduced sufficient evidence to overcome whatever negative inference may be drawn from that representation. In this connection, we are especially influenced by certain references in the October 3, 1973, agreement and the October 1975 agreements between Glacier and Young that we believe reflect their understanding as to the true character of the shares issued. In paragraph 4 of the October 3, 1973 agreement, Glacier represented that the 25,000 shares issued *303 by each corporation would represent 50 percent of the outstanding stock of each corporation. In the October 1975 agreement (at paragraph 1), Young agreed to tender to Glacier "all of its outstanding shares" in Glacier. We think that this evidence of the understanding of Glacier and Young as to the nature of the shares outweighs whatever contrary understanding as to their nature may be gleaned from the stock purchase agreement between Grant and Llanos. Having determined that Young, in substance, owned the 25,000 shares of Glacier stock that were issued to it on October 3, 1973, we hold that the distributions received by Grant and Tobey in redemption of their stock are substantially disproportionate with respect to them, within the meaning of section 302(b)(2), and therefore, are taxable as paid in exchange for their stock, section 302(a), rather than as dividends. Basis of Tobey's stock in Glacier
Cowart, the certified public account whose testimony Tobey submitted respecting the basis of his Glacier stock, was unable to determine, from Glacier's accounting records, whether the basis of Tobey's stock was $26,674.47 or $39,874.79. He was unable to determine the basis on account of his uncertainty as to how to treat one bookkeeping entry in the amount of $13,200.32. No evidence was submitted as to the transaction recorded by such bookkeeping entry or the transactions recorded by the other bookkeeping entries before us. The entries by themselves, although evidentiary, are not conclusive as to the basis of Tobey's stock. *305 See Dean v. Commissioner,57 T.C. 32, 44 (1971); Inter-City Television Film Corp. v. Commissioner,43 T.C. 270, 289 (1964). In accordance with the foregoing, we hold that Tobey has not met his burden of proving that the basis of his Glacier stock as of October 3, 1973, was $39,874.79. Rule 142(a), Tax Court Rules of Practice and Procedure.
Decision will be entered for the petitioner in docket No. 8284-79.
Decisions will be entered under Rule 155 in docket Nos. 8285-79 and 8286-79.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Glacier Bay Seafoods, Inc., docket No. 8285-79 and Harold W. and E. Maxine Tobey, docket No. 8286-79.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
3. In 1973, Norman Young was the director of Young and William H. Miles was its purchasing agent. Edwin D. Young is Norman Young's brother.↩
4. They apparently objected to a portion of the agreement that states, "It is the intention of the parties to operate through this agreement to insure payment of creditors * * *."↩
5. On the Schedule D filed with Grant's tax return for 1973, it appears as though he reported, as a result of the distribution by Glacier, long-term capital gain in the amount of $106,503. The schedule indicates that Grant had two long-term capital gains, as follows: Description
Date
Date
Gross Sales
Long-term
of Property
Acquired
Sold
Price
Basis
Capital Gain
Common Stock
3/72
10/73
$16,000
$16,000
Glacier Bay
3/72
10/73
110,503
$20,000
90,503
Seafoods
It would appear that Grant simply reported separately those proceeds that were received by him for the 1,250 shares that he transferred to Glacier at $13.50 per share (1,250 X $13.50 = $16,875) in lieu of the shares that were to have been transferred by Cater and the amount received ($110,503) by him under the formula that allegedly was agreed upon by Young.
6. See Revzin v. Commissioner,T.C. Memo. 1977-68↩.
7. See Mantell v. Commissioner,17 T.C. 1143, 1144↩ (1952), in which it was held that a deposit made by lessees did not constitute taxable income when received by lessor (lease agreement expressly provided that the deposit was not to be applied as rent).
8. SEC. 1032. EXCHANGE OF STOCK FOR PROPERTY. (a) Nonrecognition of Gain or Loss. No gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation.↩
9. SEC. 302(b). Redemptions Treated as Exchanges.-- (1) Redemptions not equivalent to dividends.-- Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend. (2) Substantially disproportionate redemption of stock.-- (A) In general.--Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder. (B) Limitation.--This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote. (C) Definitions.--For purposes of this paragraph, the distribution is substantially disproportionate if-- (i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time, is less than 80 percent of-- (ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time. For the purposes of this paragraph, no distribution shall be treated as substantially disproportionate unless the shareholder's ownership of the common stock of the corporation (whether voting or non-voting) after and before redemption also meets the 80 percent requirement of the preceding sentence. For purposes of the preceding sentence, if there is more than one class of common stock, the determinations shall be made by reference to fair market value. (D) Series of redemptions.--This paragraph shall not apply to any redemption made pursuant to a plan the purpose or effect of which is a series of redemptions resulting in a distribution which (in the aggregate) is not substantially disproportionate with respect to the shareholder. (3) Termination of shareholder's interest.--Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.↩
10. In their brief petitioners assert that respondent incorrectly contends, as an alternative argument, that Grant and Tobey received for the redemption of their shares an amount exceeding the amount agreed upon by Young and that the excess, therefore, should be treated as a dividend. Although respondent previously may have made this argument, we are unable to find any place in the record where he does so. In any event, we would consider respondent to have abandoned this argument, if he made it, as he made no argument either at trial or in his brief to support it. See Duncan Industries, Inc. v. Commissioner,73 T.C. 266, 275↩ n.8 (1979).
11. After the redemption, Grant and Tobey would each own less than 50 percent (11,250 shares/50,000 shares = 22.5 percent) of the total combined voting power of all classes of stock entitled to vote. Section 302(b)(2)(B). Since before the transaction each owned 41.5 percent (20,750 shares/50,000 shares) of Glacier's sole class of outstanding stock, the redemption would be disproportionate with respect to each of them if after it each owned less than 33.2 percent (80 percent X 41.5 percent) of its outstanding stock. Section 302(b)(2)(C) and section 302(b) ("flush" language). Since after the redemption, each would own 22.5 percent (11,250 shares/50,000 shares) of its outstanding stock, the redemption would be substantially disproportionate, within the meaning of section 302(b)(2)↩, with respect to Tobey and Grant.
12. Cf. Madden v. Commissioner,T.C. Memo. 1980-350, in which this Court found that the taxpayer, who had obtained shares of stock in two corporations as collateral for advances, could not, based on the facts in that case, be regarded as holding the shares only as security for the advances, but was regarded as having acquired an equity interest in the corporations. (The shares were held by the taxpayer in his name. After he received the shares, he became an officer of both corporations and became involved in their day-to-day activities.)
13. Grant contends that, in fact, his 11,250 shares in each corporation represented only 22.5 percent of the outstanding stock of each company; that is, he contends that each company had 50,000 shares outstanding, since Young held 25,000 shares of each company with all incidents of stock ownership. He contends that since Llanos and his wife had conducted an examination of Glacier's books and records, they were aware that the 11,250 shares which Llanos was acquiring in each corporation represented only 22.5 percent of the outstanding stock of each corporation. At trial, Grant conjectured that the attorneys who wrote the stock purchase agreement may have used the 45 percent figure in it either inadvertently by adding together the percent of stock that he owned in Glacier and in Sales or intentionally to conceal Young's alleged ownership in Glacier.